# In the United States Court of Federal Claims

### No. 20-926C

### Filed: December 29, 2020
### Redacted Version Issued for Publication: January 15, 2021[1]

* * * * * * * * * * * * * * * * *

|  |  |
|---|---|
| **AGMA SECURITY SERVICE, INC.,** | * |
|  | * |
|  | * |
| **Protestor,** | * |
|  | * |
| **v.** | * |
|  | * |
| **UNITED STATES,** | * |
|  | * |
| **Defendant,** | * |
|  | * |
|  | * |
| **v.** | * |
|  | * |
| **RANGER AMERICAN OF PUERTO RICO,** | * |
|  | * |
| **Defendant-Intervenor.** | * |

* * * * * * * * * * * * * * * * *

**Alan M. Grayson,** Windermere, FL for protestor.

**Kara M. Westercamp,** Department of Justice, Washington, DC**,** Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, for defendant. With her were **Elizabeth M. Hosford**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Jeffrey Bossert Clark**, Acting Assistant Attorney General, Civil Division. Of counsel was **Matthew Lane**, Office of Chief Counsel, Procurement and Fiscal Legal Division, Federal Emergency Management Agency.

**Jonathan D. Shaffer,** Smith Pachter McWhorter PLC, Tysons Corner, VA for intervenor. With him was **Todd M. Garland**, Smith Pachter McWhorter PLC, Tysons Corner, VA.

---

[1] This Opinion was issued under seal on December 29, 2020. The parties were asked to propose redactions prior to public release of the Opinion. This Opinion is issued with the redactions that the parties proposed in response to the court's request and other conforming redactions. Words which are redacted are reflected with the notation: "[redacted]."

# O P I N I O N

**HORN, J.**

        In the above-captioned, post-award bid protest, protestor AGMA Security Service, Inc. (AGMA) challenges the decision of the Federal Emergency Management Agency (FEMA) to award a contract to intervenor Ranger American of Puerto Rico arguing that the award was "arbitrary, capricious, irrational, unreasonable, incoherent, unsupported by the record, and contrary to law."

## FINDINGS OF FACT

        On November 19, 2019, FEMA issued Request for Proposal No. 70FBR220R00000002 (the RFP). The RFP indicated that "[t]his requirement is for contracted Protective Service Officers (PSO) and Patrolled Services to safeguard federal employees, visitors and property at both temporary and fixed facilities during disaster and emergency declarations for DR-4339 (all counties and municipalities within the Commonwealth of Puerto Rico)." Ranger American of Puerto Rico was the incumbent contractor for the predecessor contract which provided "the same armed security services for FEMA in Puerto Rico."

        The RFP's statement of work explained that

> [t]he Federal Emergency Management Agency (FEMA) uses contracted Protective Service Officers (PSO) to safeguard federal employees, visitors and property at both temporary and fixed facilities during disaster and emergency declarations. After the island of Puerto Rico was devastated by [sic] Hurricane Maria disaster DR-4339-PR was declared by the President placing FEMA locations around the entire island to support all Recovery efforts.

The statement of work further explained that "[t]he contractor must perform duties/tasks necessary to provide PSOs for physical security services throughout the entire island of Puerto Rico including municipalities of Vieques and Culebra. Patrol vehicles shall be provided when required by FEMA based on location characteristics, vulnerabilities and risks."

        The RFP also indicated that "[t]he Government intends to award a Labor Hour type contracts [sic] resulting from this solicitation to the responsible offerors whose offers, conforming to the solicitation, are most advantageous to the Government, price and other factors considered. Award will be made to the responsive, responsible contractor who

provides the best-valued solution to the Government." The period of performance was a one year base period, and then a one-year option period. [2] The RFP explained

> [t]he acquisition and source selection are being conducted in accordance with the procedures of Federal Acquisition Regulation (FAR) Parts 12 and 15. The acquisition will be conducted using Best Value as the evaluation methodology. Proposals will be evaluated and rated but not ranked using the non-price factors listed below. A rating of "Unacceptable" in any of the below technical factors will render the entire proposal technically unacceptable and, therefore, not eligible for award.
> 1. Work Plan
> 2. Project Management Plan
> 3. Quality Control Plan
> 4. Past Performance
> 5. Price[.]

In addition, the RFP explained the methodology for making an award:

> Factor 1 – Work Plan
>
> Each offeror's work plan shall be evaluated on its demonstrated ability to provide staffing throughout the Commonwealth (all municipalities) of Puerto Rico necessary to accomplish the tasks outlined in the Statement of Work (SOW). The work plan shall fully describe the offeror's proposed solution to achieve requirements of the SOW and address the offeror's technical approach and methodology. The work plan shall be specific, detailed and complete enough to demonstrate that the offeror has a thorough understanding of the requirements in the SOW. The resume of the proposed Key Personnel (Project Manager) shall be evaluated based on the depth and breadth of the person's experience in managing requirements similar to the immediate requirement.
>
> Factor 2 – Project Management Plan
>
> Each offeror's Project Management Plan shall evaluate on its demonstrated project management and oversight capability. Significant emphasis shall be placed on the offeror's proposed plan to manage its workforce.
>
> Factor 3 – Quality Control Plan
>
> Each offeror's Quality Control Plan shall be evaluated on how well it demonstrates the offeror's ability to establish and execute a quality control

---

[2] As indicated in the parties' submissions, "[n]ot relevant here, the original period of performance was a three-month base contract with five option periods of three months each, which was later adjusted to a one year base period, with a one-year option." (internal reference omitted).

plan, whereby the contractor manages and monitors the process and takes the appropriate corrective action to correct performance to meet program objectives.

The RFP further explained:

The Technical Approach Factor will be evaluated against the stated criteria using the following descriptive adjectival ratings and definitions:
o **Strength**: An element of a proposal which exceeds a requirement of the solicitation in a beneficial way
o **Weakness**: A flaw in a proposal that increases the chance of unsuccessful performance.
o **Omission**: An element of the government's requirement that has been overlooked and excluded from the proposal
o **Deficiencies**: A serious flaw or a combination of weaknesses in a proposal that increases the risk of unsuccessful contract performance to a potential unacceptable level.

(all emphasis in original). The RFP also included the following chart to explain the rating system for the Technical Factors.

| Rating System for Technical Factor 1 -3 | |
|---|---|
| **Rating** | **Definition** |
| Superior | Proposal demonstrates an excellent understanding of the requirements and an approach that significantly exceeds performance or capability standards. Proposal strengths will significantly benefit the Government and risk of unsuccessful performance is low. No significant weaknesses or deficiencies exist. |
| Good | Proposal demonstrates a thorough understanding of the requirements and an approach that exceeds performance or capability standards. Proposal has one or more strengths that will benefit the Government and risk of unsuccessful performance is low. No significant weaknesses or deficiencies exist. |
| Satisfactory | Proposal demonstrates an understanding of the requirements and an approach that meets performance or capability standards. Proposal presents an acceptable solution with few or no strengths and risk of unsuccessful performance is moderate. No significant weaknesses or deficiencies exist. |
| Marginal | Proposal demonstrates a shallow understanding of the requirements and an approach that only marginally meets performance or capability standards necessary for minimal but acceptable contract performance. Significant weaknesses or deficiency exists that may be correctable without major proposal revisions. The risk of unsuccessful performance is high. |
| Unsatisfactory | Proposal fails to meet requirements and one or more deficiencies exist for which correction would require a major revision or redirection of the proposal. A contract cannot be awarded with this proposal. |

(capitalization and emphasis in original).

> The RFP explained that for Past Performance:
>
> The Government shall evaluate the submitted past performance information for each offeror as well as information obtained from any other available sources. The past performance evaluation will assess the offeror's record of how well the offeror performed on relevant work for government and private sector clients. The Government will not restrict its consideration to the information provided in the proposal and may consider any other available information including any records in the Past Performance Information Retrieval System (PPIRS). An offeror with no recent or relevant past performance will be assigned a rating of neutral for this factor.

The RFP continued:

> The Past Performance Factor will be evaluated against the stated criteria and the rating assigned to each individual past performance record using the following descriptive adjectival ratings and definitions:
>
> Relevance - The Government is not bound by the offeror's opinion of relevance. The following definitions apply:
>
> Relevant Past/present performance effort involved the same or much of the magnitude of effort, complexities, and contract dollars this RFP requires.
>
> Not Relevant: Past/present performance effort did not substantially involve the effort, complexities and contract dollars this RFP requires. An Offeror with no relevant past performance history will receive a rating of "Neutral."

The RFP also included the following chart to explain the rating system for the Past Performance factor:

| Rating System for Past Performance Evaluation Factors | |
|---|---|
| **Rating** | **Definition** |
| Neutral | No relevant performance record is identifiable upon which to base a meaningful performance rating. A search was unable to identify any relevant past performance information for the offeror, key personnel, or subcontractors. This is neither a negative or positive assessment. |
| Superior | Based on the offeror's past performance record, it is highly likely that the offeror will successfully perform the required effort. |
| Satisfactory | Based on the offeror's past performance record, it is likely that the offeror will successfully perform the required effort. |
| Unsatisfactory | Based on the offeror's past performance record, it is not likely that the offeror will successfully perform the required effort. |

(capitalization and emphasis in original).

For the Price factor, the RFP simply indicated: "Sufficient competition is expected for this procurement, therefore, price analysis will be utilized to determine a fair and reasonable price. Price evaluation will be based on the total amount for all CLINs as proposed on the attached Price Evaluation Worksheet including the base period and each option period for each of the Locations."[3]

The RFP's "Basis for Award" explained:

The awards will be made based on a "Best Value-Tradeoff" basis. The technical factors have been placed in descending order of importance. Factor 1, Technical Specifications is the most important Factor, being more important than Factors 2, 3 & 4 combined. In determining which proposal provides the best value to the Government, non-price evaluation factors are more important than evaluated price. These non-price factors, when combined, are more important than Factor 5 Price. The Government intends to award a Labor Hour type contracts resulting from this solicitation to the responsible offerors whose offers, conforming to the solicitation, are most advantageous to the Government, price and other factors considered. Award will be made to the responsive, responsible contractor who provides the best-valued solution to the Government.

Among the FAR provisions the RFP incorporated was FAR 52.226-4, which stated in the RFP:

(a) Set-aside area. Offers are solicited only from businesses residing or primarily doing business in Puerto Rico (all municipalities). Offers received from other businesses shall not be considered.
(b) This set-aside is in addition to any small business set-aside contained in this contract.

One of the representations that an offeror was required to respond to was with regard to FAR 52.226-3. As stated in the RFP:

**E.8 52.226-3 Disaster or Emergency Area Representation (Nov 2007)**

(a) Set-aside area. The area covered in this contract is the entire island of Puerto Rico including municipalities of Vieques and Culebra.

---

[3] Regarding options for pricing, the RFP also stated that "[t]he Government will evaluate offers for award purposes by adding the total price for all options to the total price for the basic requirement. The Government may determine that an offer [sic] is prices are significantly unbalanced. Evaluation of options shall not obligate the Government to exercise the option(s)."

(b) Representations. The offeror represents that it [ ] does [ ] does not reside or primarily do business in the set-aside area.[4]

(c) An offeror is considered to be residing or primarily doing business in the set-aside area if, during the last twelve months—

(1) The offeror had its main operating office in the area; and

(2) That office generated at least half of the offeror's gross revenues and employed at least half of the offeror's permanent employees.

(d) If the offeror does not meet the criteria in paragraph (c) of this provision, factors to be considered in determining whether an offeror resides or primarily does business in the set-aside area include—

(1) Physical location(s) of the offeror's permanent office(s) and date any office in the set-aside area(s) was established;

(2) Current state licenses;

(3) Record of past work in the set-aside area(s) (*e.g.,* how much and for how long);

(4) Contractual history the offeror has had with subcontractors and/or suppliers in the set-aside area;

(5) Percentage of the offeror's gross revenues attributable to work performed in the set-aside area;

(6) Number of permanent employees the offeror employs in the set-aside area;

(7) Membership in local and state organizations in the set-aside area; and

(8) Other evidence that establishes the offeror resides or primarily does business in the set-aside area. For example, sole proprietorships may submit utility bills and bank statements.

(e) If the offeror represents it resides or primarily does business in the set-aside area, the offeror shall furnish documentation to support its representation if requested by the Contracting Officer. The solicitation may require the offeror to submit with its offer documentation to support the representation.

(emphasis in original). Additionally, the RFP included a "Local Area Documentation Requirement:"

Pursuant to FAR 52.226-3(e), in addition to certification of FAR Provision 52.226-3(b), Offerors shall submit the following to support its representation that it resides or primarily does business in the disaster or emergency area: (c) An offeror is considered to be residing or primarily doing business in the set-aside area if, during the last twelve months—

*(1)* The offeror had its main operating office in the area *(offeror shall present a copy of a current main operating office building ownership/lease*

---

[4] The RFP included a notation that "(PARAGRAPH (b) OF THE ABOVE CLAUSE MUST BE COMPLETED AND SUBMITTED WITH YOUR QUOTE)." (capitalization in original).

*documentation as supporting evidence and evidence of domestic registration with the office of the Puerto Rico Secretary of State*); and
(2) That office generated at least half of the offeror's gross revenues and employed at least half of the offeror's permanent employees (*offeror shall present supporting documents showing the offeror's gross revenues during the past 12 months, including previous IRS tax year records, as supporting evidence and supporting documents demonstrating that its main operating office in the set- aside area employed at least half of the offeror's permanent employees*).
**If the offeror does not meet the criteria in paragraph (c)** of this provision, in accordance with FAR 52.226-3(d), offerors shall provide at least:
1. Physical location(s) of the offeror's permanent office(s) and date any office in the set aside area(s) was established
• Offeror shall present a copy of a current operating office building ownership/lease documentation as supporting evidence of any permanent office(s) and any office(s) in the set-aside area)
2. Current state licenses;
3. Other evidence that establishes the offeror resides or primarily does business in the set-aside area.

(all emphasis in original).

Protestor AGMA and intervenor Ranger American of Puerto Rico were among nine offerors which submitted timely proposals to FEMA in response to the RFP, which required proposals to be submitted by December 19, 2019.[5] Per the requirements of the RFP, AGMA and Ranger American of Puerto Rico both checked the box to indicate "the offeror represents that it does reside or primarily do business in the set-aside area." AGMA submitted supporting documentation with its proposal. Likewise, Ranger American of Puerto Rico submitted supporting documentation with its proposal, which included the following documents:

- Certificate of Incorporation
- Certificate of Existence
- Certificate of Good Standing
- Private Detectives Agency License
- Safety Agency License
- Total Waiver Certificate
- Municipal Patent
- Merchant Registration Certificate
- ASG - Eligibility Certificate
- CRIM - Personal Property Tax Certificate

---

[5] As indicated in defendant's cross-motions for judgment on the Administrative Record, "both Ranger and AGMA submitted revised pricing proposals in response to the contracting officer's notification that the term of the contract had changed to a one-year base period and one-year option period, rather than the contract's duration stated in the RFP."

• CRIM - Statement of Account
• CRIM - Negative Certification of Property
• CRIM - Certification for all concepts
• Hacienda IVU - Certificate of Debts (Electronic Validation included)
• Hacienda IVU - Tax Certification (Electronic Validation included)
• Hacienda - Tax Contribution Certification
• Hacienda - Certificate of Debts
• Municipal Patent - Certificate of Debts
• ASUME - Certificate of Compliance Status
• CFSE - Certificate of Insurance
• CFSE - Certificate of Debts
• Labor Department
o Certificate of Drivers Insurance Program
o Certificate of Unemployment & Disability Insurance

In response to the contracting officer's request for clarifications, on January 9, 2020, Ranger American of Puerto Rico submitted a letter which stated, in part:

> Ranger American's corporate headquarter is the most modern, customized, and state of the art security facility in Puerto Rico and the Caribbean. We are responsible and accountable for the security of our clients in Puerto Rico and other islands. Therefore, our headquarters contain a unique infrastructure to our survivability and the continuance of our field operations. Our headquarter in San Juan is a 48,000 square feet concrete building, with over 100 parking spaces, protected by a concrete and barbed wire perimeter fence. The facility houses our armored car operation, making this one of the most secure structure anywhere. The infrastructure for our headquarters was meticulously designed and engineered to provide survivability, and sustainability of our operations.

For evaluation of the proposals, the Source Selection Evaluation Board (SSEB) evaluated the nine proposals received, and each member of the SSEB evaluated the proposals' strengths and weaknesses against the four evaluation factors in the RFP: Factor 1 - Work Plan, Factor 2 - Project Management, Factor 3 - Quality Control, Plan, Factor 4 – Past Performance. The SSEB "establish[ed] a consensus rating for each proposal," and adopted a "methodology used for overall rating results." The SSEB created a ratings chart to adjectival value and then "assign[ed] overall ranges based on the total points received." The SSEB noted that

> [t]he SSEB understands Offeror 6 [Ranger American of Puerto Rico] poses less risk of non-compliance to the Government and is the most diligent in submitting an adequate and complete. Their statements included have been vetted and are enough to comply with all required responsibilities. For this reason, the SSEB recommends Offeror 6 for award. This decision is based on an impartial and individual evaluation by each member of the SSEB of all offeror proposals submitted. Each evaluation factor was

9

considered, as per the RFP, and results were weighted for a final overall rating for each offeror.

After the SSEB completed the evaluation of the proposals, on March 3, 2020, the contracting officer issued an initial Award Decision Memorandum, which summarized the background of the procurement and the evaluations of the SSEB, and included a technical evaluation, price evaluation, a best value analysis and finally an award decision. The initial Award Decision Memorandum section titled, "Evaluation Results and Analysis," explained:

> The proposal was evaluated separately against the Evaluation Factors established in the Request for Proposal (RFP) Section E. The SSEB conducted its evaluation in accordance with the evaluation plan. Each evaluator independently evaluated and rated the proposal. The team then convened with the results of their evaluation, and collectively agreed to the ratings and technical acceptability of each proposal as shown below.

The Award Decision Memorandum section titled, "Consensus Rating Chart," stated:

> The chart below (Table 1- "RATING CHART") reflects the consensus ratings that the offerors received in each of the four (4) factors Workplan, Project Plan, Quality Control, and Past Performance, plus an overall factor rating. All four factors were evaluated by each individual evaluator considering the requirement as per the Statement of Work (SOW) and the RFP in order to increase the impartiality of a consensus evaluation. CPARS reviews were considered for those that provided a contract number for a past agreement with the Federal government. The offerors received overall ratings based on the evaluation factor consensus results which was based on the demonstrated ability to fulfill the requirement. The methodology used for overall rating results was giving empirical values (See table 3- "RATING CHART BREAKDOWN") to each adjectival value (see table 2 "EMPIRICAL VALUES RATING CHART") and assign overall ranges based on the total points received (See table 4- "OVERALL RATING RANGE"). An analysis of the board's findings to include the vendor's strengths and/or weaknesses is discussed below in Table 1: Consensus.

(all capitalization and emphasis in original). The Award Decision Memorandum next included four charts for a summary of the technical ratings: a rating chart, an empirical values rating chart, a ratings chart breakdown, and the overall rating range. The four charts provided:

Summary of Technical Ratings
Table 1

| RATING CHART | | | | | |
|---|---|---|---|---|---|
| **Offeror:** | **Factor 1** | **Factor 2** | **Factor 3** | **Factor 4** | *Overall Factor Rating* |
| Offeror 1: [redacted] | Unsatisfactory | Unsatisfactory | Unsatisfactory | Neutral | **Unsatisfactory** |
| Offeror 2: Agma Security Service Inc. | Good | Satisfactory | Satisfactory | Neutral | **Satisfactory** |
| #3 Offeror 3: [redacted] | Unsatisfactory | Unsatisfactory | Unsatisfactory | Neutral | **Unsatisfactory** |
| Offeror 4: [redacted] | Unsatisfactory | Unsatisfactory | Marginal | Neutral | **Unsatisfactory** |
| Offeror 5: [redacted] | Unsatisfactory | Unsatisfactory | Unsatisfactory | Satisfactory | **Unsatisfactory** |
| Offeror 6: Ranger American | Good | Good | Good | Good | **Good** |
| Offeror 8: [redacted] | Marginal | Satisfactory | Satisfactory | Satisfactory | **Satisfactory** |
| Offeror 9: [redacted] [6] | Marginal | Marginal | Marginal | Satisfactory | **Marginal** |

---

[6] The SSEB explained that: "During the initial screening, Offeror 7 [redacted] was deemed ineligible for award. Offeror does not reside or primarily doing [sic] business in the disaster area in accordance with FAR 52.226-3 Disaster or Emergency Area Representation and therefore were [sic] not evaluated."

11

Table 2

| | | | | | Total Empirical Value | Converted Empirical Value to Overall Rating |
|---|---|---|---|---|---|---|
| **EMPIRICAL VALUES RATING CHART** | | | | | | |
| *Offeror:* | *Factor 1* | *Factor 2* | *Factor 3* | *Factor 4* | *Total Empirical Value* | *Converted Empirical Value to Overall Rating* |
| #1 | 1 | 1 | 1 | 0 | **3** | Unsatisfactory |
| #2 [AGMA] | 4 | 3 | 3 | 0 | **10** | Satisfactory |
| #3 | 1 | 1 | 1 | 0 | **3** | Unsatisfactory |
| #4 | 1 | 1 | 1 | 0 | **3** | Unsatisfactory |
| #5 | 1 | 1 | 1 | 2 | **5** | Unsatisfactory |
| #6 [Ranger] | 4 | 4 | 4 | 4 | **16** | Good |
| #8 | 1 | 3 | 3 | 2 | **9** | Satisfactory |
| #9 | 1 | 1 | 1 | 2 | **5** | Marginal |

Table 3

| **RATING CHART BREAKDOWN** | | | |
|---|---|---|---|
| *Factors 1 - 3* | *Numerical Rating* | *Factor 4* | *Numerical Rating* |
| Superior | 5 | | |
| Good | 4 | Superior | 3 |
| Satisfactory | 3 | Satisfactory | 2 |
| Marginal | 1 | Unsatisfactory | 1 |
| Unsatisfactory | 1 | Neutral | 0 |

Table 4

| **OVERALL RATING RANGE** | |
|---|---|
| *Overall Rating* | *Rating Range* |
| Superior | 18 |
| Good | 14 to 17 |
| Satisfactory | 10 to 13 |
| Marginal | 6 to 10 |
| Unsatisfactory | 3 to 5 |

(all capitalization and emphasis for all charts in original; brackets added).[7] Although the RFP makes no mention of "empirical values ratings" system, the contracting officer included the empirical values ratings chart in the initial Award Decision Memorandum and

---

[7] Except for the brackets to identify the protestor and intervenor, the charts are as they appear in the initial Award Decision Memorandum and not intuitively obvious as to the method or organization.

changed the rating chart, as shown in Table 1, into the empirical values ratings, the rating chart breakdown, and the overall rating range, as indicated in Tables 2, 3, and 4. In the contracting officer's July 31, 2020 declaration attached to defendant's cross-motion for judgment on the Administrative Record, the contracting officer stated, "[f]or assistance in assessing relative technical strengths, I used a system that converted the adjectival ratings into numerical scores." Therefore, the initial Award Decision Memorandum including both technical ratings assigned to the offerors and empirical values ratings assigned to the offerors.

After including the charts with the adjectival and numerical ratings, the Award Decision Memorandum included a detailed breakdown of each offeror.[8] Below are the breakdowns for AGMA and Ranger American of Puerto Rico:

Offeror 2: AGMA Security Service Inc [sic]                Rating: Satisfactory

Offeror 2's proposal demonstrated a probability of success to support FEMA's requirement. The offeror had previous experience with FEMA but had no CPARS records. Offeror 2 provided in detail how they would execute the requirement, with a good workplan including a proper transition, good management considering most challenges, and a reasonable Quality Control (QC) Plan.

**Factor 1 - Workplan: Good**

Strengths include:

o Demonstrated the ability to make a seamless transition and accounted for the required services. (Section 1: Workplan, page 1, paragraph 2, 6; page 2 paragraph 1, 2; page 3, paragraph 3)

o Proper execution including a detailed description of a proper chain of command and a well-planned timeline (Section 1: Workplan, page 1 paragraphs 3-5, page 2 paragraph 4-6 [sic]

o Offeror demonstrates to have the capability to fulfill the staffing demand in this requirement (footnote page 2).

Weakness include:

o None

Deficiencies include:

---

[8] The Award Decision Memorandum included a summary of all the offerors, but this Opinion only quotes the evaluation of AGMA and Ranger American of Puerto Rico, as the evaluations of the protestor and the intervenor are the only ones at issue in the current protest.

o None

**Factor 2 – Project Management Plan: Satisfactory**

Strengths include:

o Demonstrated the ability to effectively manage the contract (Section 2: Project Management Plan in its entirety page 3-4).

o Offeror has a proper plan in place to fulfill staffing island-wide (Section 2: Project Management Plan page 3 paragraphs 5-6).

o Proper assigned supervision (Section 2: Project Management Plan page 4 paragraph 1-5).

o Detailed description of distribution of resources (Section 1: Workplan, page 1 last paragraph, continued page 2 first paragraph and page 2 footnote).

Weakness include:

o None

Deficiencies include:

o None

**Factor 3 – Quality Control Plan: Satisfactory**

Strengths include:

o Offeror has staff designated for Quality Control (Section 3: Quality Control Plan, page 5, paragraph 3).

o Good plan for physical inspections and reporting tools (Section 3, page 5, paragraph 2, 5, 6; page 6 all paragraphs; page 7, paragraphs 1-4).

o Good corrective actions plan Section 3, Paragraph 5-6; page 8, paragraph 1-4).

Weakness include:

o None

Deficiencies include:

o None

**Factor 4 – Past Performance: Neutral**

Strengths include:

o None

Weakness include:

o None

Deficiencies include:

o None

. . .

Offeror 6: Ranger American of Puerto Rico Inc [sic]          Rating: Good

Offeror 6 is the vendor for the current contract. They relied on their efficacy to execute the new contract to the "successful" execution of the current contract. The offeror demonstrates the capability to comply with the requirement as established. The offeror demonstrates that they have vast staffing capabilities to meet requirements and beyond. A detailed Project Management Plan was provided. A rigorous training schedule was presented with a good command/field operations structure to complement. Offeror diligently provided the "Use of Force" policy and a sample of physical inspections spreadsheet they use to ensure PSO compliance.

**Factor 1 - Workplan: Good**

Strengths include:

o Offeror references effective modus operandum in current contract (Section: Introduction, page 1, paragraph 6).

o Offeror states a continuation of services would not require a transition (Section 1: Workplan, page 2, paragraph 2).

o Vast staffing capabilities (Section 1, page 2, paragraph 3).

Weakness include:

o None

Deficiencies include:

o None

**Factor 2 – Project Management Plan: Good**

Strengths include:

o Offeror presents in detail the contract management responsibilities, risk avoidance, and insurance of performance making the contract transition a seamless continuity of operations (Section 1: Workplan, page 2, paragraph 3).

o Good command and field operations structure (Section 2: Project Management Plan, subsection Site Leaders, page 5 graph, paragraphs 1-3).

o Contingency plan set in place (Section 2, page 3, paragraph 4).

Weakness include:

o None

Deficiencies include:

o None

**Factor 3 – Quality Control Plan: Good**

Strengths include:

o The offeror demonstrates a rigorous Quality Control system in place (Section 3: Quality Control Plan, page 5, paragraph 1-2).

o Quality Control for this offeror includes monitoring processes, field inspections, supporting software, cost control software, reporting capacity, disciplinary strategies, and internal investigations (Section 3, sub-section Technology, page 8, paragraph 1).

o Monitoring documentation developed ensuring compliance (proposal attachment).

o Robust training schedule potentially maximizing quality of work (Section 3, page 6, paragraph 3; and attachment "Training [sic] Manuals protocol).

Weakness include:

o None

Deficiencies include:

o None

**Factor 4 – Past Performance: Good**

Strengths include:

o In CPARS, offeror has two evaluations where they are described as "very good" and exceptional in all categories on both.

Weakness include:

o None

Deficiencies include:

o None

(capitalization and emphasis in original). The Award Decision Memorandum section titled, "Price Evaluation," stated:

> The final price evaluation was conducted after the Technical Evaluation Team (TET) completed their evaluation. The price proposals were evaluated separately from the technical evaluation. Of the Offerors nine (9) received, one Offeror was deemed ineligible and was not evaluated for an award; three (3) received a *technical rating* of Acceptable, and five (5) received a *technical rating* of "Unacceptable" for Solicitation 70FBR220R00000002, Armed Security Guards for DR-4339 Puerto Rico. Price reasonableness was conducted in accordance with solicitation Section E.6 FAR 52.212-2 Evaluation – Commercial Items.

> Sufficient competition resulted from the solicitation; therefore, price reasonableness was utilized to determine if pricing was fair and reasonable. Price evaluation was based on the total amount for all CLINs as proposed on the Price Evaluation Worksheet including the base period and option period. All non-price factors, when combined, are slightly more important than price.

(emphasis in original). Regarding price, the contracting officer in the Award Decision Memorandum explained:

> The price proposals for the remaining Offerors 2, 6, 8 and 9 were evaluated separately from the Technical evaluation. Those Offerors that were deemed technically acceptable were notified via email that the performance period changed to one base period and a one-year option period, and a price revision request was issued to Offerors 2, 6, 8 and 9.

| OFFEROR NAMES | Qty Labor Hrs. | Revised Hour Rates | Revised Vehicles (3) Daily Rate | TOTAL |
|---|---|---|---|---|
| OFFEROR2: AGMA Security Service Inc. [redacted] | 295,288 | $[redacted] | $[redacted] per vehicle | $[redacted] |
| OFFEROR 6: Ranger American of PR, Inc. [redacted] | 295,288 | $[redacted] | $[redacted] | $[redacted] |
| OFFEROR 8: [redacted] | 295,288 | $[redacted] | $[redacted] | $[redacted] |
| OFFEROR 9: [redacted] | 295,288 | $[redacted] | N/C | $[redacted] |

> This determination was based off adequate competition and comparison to the original independent government cost estimate of $[redacted].

> AGMA's total, proposed, evaluated price was of $[redacted] and Ranger American of Puerto Rico's total proposed evaluated price was $[redacted].

Defendant explained that, "[i]n reviewing the SSEB's determination, the contracting officer's award memorandum adopted the board's technical evaluations, without changes." Regarding the evaluation of AGMA's and Ranger American of Puerto Rico's proposals in the best value trade-off analysis, the contracting officer in the Award Decision Memorandum explained:

> The non-price factors; Factor 1 – Work Plan, Factor 2 – Project Management, Factor 3 – Quality Control Plan, Factor 4 – Past Performance and Factor 5 – Price, are the contributing factors in awarding to AGMA AGMA received a rating of Good for Factor 1, Satisfactory for Factors 2 - 3; Factor 4 received a rating of Neutral.

> Factor 6 [sic] Price was non-rated.

> Offeror 2, AGMA Security Service Inc. proposed Work Plan demonstrates a Good understanding a probability of success to support FEMA's requirement. AMGA [sic] demonstrated the ability to make a seamless transition and accounted for the required services. (Section 1: Workplan,

page 1, paragraph 2, 6; page 2 paragraph 1, 2; page 3, paragraph 3). AGMA provided in detailed description of a proper chain of command and a well-planned timeline (Section 1: Workplan, page 1 paragraphs 3-5, page 2 paragraph 4-6. Offeror demonstrates to have the capability to fulfill the staffing demand in this requirement (footnote page 2).

AGMA's proposed Project Management Plan demonstrates in their ability to effectively manage the contract (Section 2: Project Management Plan in its entirety page 3-4). AGMA has a proper plan in place to fulfill staffing island-wide (Section 2: Project Management Plan page 3 paragraphs 5-6). AGMA proper assigned supervision (Section 2: Project Management Plan page 4 paragraph 1-5) and provided a detailed description of distribution of resources (Section 1: Workplan, page 1 last paragraph, continued page 2 first paragraph and page 2 footnote).

AGMA's proposed Quality Control Plan demonstrates a staff designated for Quality Control (Section 3: Quality Control Plan, page 5, paragraph 3). Quality Control includes a Good plan for physical inspections and reporting tools (Section 3, page 5, paragraph 2, 5, 6; page 6 all paragraphs; page 7, paragraphs 1-4) and a Good corrective action plan Section 3, Paragraph 5-6; page 8, paragraph 1-4) was provided.

AGMAs overall rating is Satisfactory on both technical and past performance. Although Ranger received a rating of Good. Contracting Officer determined that there was no rational that substantiates paying a higher price to Ranger when the same services could be provided from AGMA.

The contracting officer did not discuss the SSEB's recommendation for award, but concluded: "AGMA's proposal offers the best overall value to the Government and price is determined to be fair and reasonable."

On March 13, 2020, FEMA made the award to AGMA, and notified Ranger American of Puerto Rico of the same. Ten days later on March 23, 2020, Ranger American of Puerto Rico filed a protest at the United States Government Accountability Office (GAO). Ranger American of Puerto Rico's GAO protest alleged that FEMA had not properly evaluated the Technical Factors, and further argued that FEMA had not conducted a proper trade-off and best-value determination. Specially, the GAO protest state: "Contrary to the RFP and FAR, FEMA jettisoned the RFP evaluation criteria, which gave greater weight to the non-price factors and awarded to AGMA based on an illusory price only." Ranger American of Puerto Rico also argued that at the GAO:

Among other things, Ranger American offered (1) a superior proposal for the Work Plan, Project Management Plan, and Quality Control Plan factors, with many strengths and discriminators; (2) overwhelming superior past performance that substantially reduced risk and added value; and (3) a

proposed price to the agency that provided high confidence that the work would be performed satisfactorily and efficiently within the price promised and the Work Plan, Project Management Plan, and Quality Control Plan proposed. Ranger American was materially prejudiced by the agency's failure to properly evaluate proposals under Factors 1, 2, 3, and 4, and to meaningfully consider the discriminators between the Ranger American and AGMA proposals. FEMA's material evaluation errors and failure to conduct a reasonable trade-off and best value determination were contrary to CICA [the Competition in Contracting Act], the FAR, and the RFP terms. If the agency had reasonably evaluated in accordance with the RFP, Ranger American would have received the highest rating for the non-price factors and AGMA would have received reduced ratings under the non-price factors. Moreover, Ranger American had numerous strengths that the agency failed to credit, contrary to the RFP's evaluation criteria and Ranger American's proposal. The agency's failure to recognize strengths in Ranger American's proposal resulted in an unfair and disparate evaluation of Ranger American's proposal.

FEMA also ignored information too close at hand regarding AGMA's deficient past performance. AGMA previously failed on a FEMA contract for similar requirements and otherwise has a poor or inadequate past performance history. If FEMA had reasonably evaluated in accordance with the RFP terms, FEMA would have rated AGMA unsatisfactory or certainly no higher than satisfactory.

The agency carried these errors over into the tradeoff and best value determination. A tradeoff analysis and best value determination based on errors in the evaluation is itself defective. Moreover, the errors in the evaluation mean the agency failed to properly account for the actual discriminators between the proposals in Ranger American's favor. If FEMA had properly considered those discriminators in its evaluation, Ranger American would have received award as best value.

The FEMA best value and trade-off analysis was further materially flawed and unreasonable because it failed to reconcile apparent material disconnects or contradictions between the AGMA non-price and price factors. The AGMA price reflects a buy-in and failure to reasonably and realistically price the RFP requirements. AGMA's non-price proposal may have included some blanket statement of compliance, but AGMA's illusory low price reflects a lack of understanding of contract and labor law requirements and a failure to price what it proposed under the non-price factors. Combined with AGMA's unsatisfactory past performance record, the AGMA proposal presents substantial risk that FEMA failed to consider.

In response to Ranger American of Puerto Rico's protest, on April 13, 2020, FEMA notified GAO:

The Federal Emergency Management Agency (FEMA or Agency), of the United States Department of Homeland Security (DHS), hereby requests that you dismiss the above-captioned protest because, after careful consideration of the protester's allegations and the procurement record, FEMA has decided to take corrective action. This corrective action will consist of a reevaluation of the protester's and awardee's proposals as well as a new award decision. FEMA may also take any other corrective action it deems appropriate. Due to the Agency's corrective action, the bases for the protest are no longer valid and, therefore, this protest is academic and should be dismissed. *General Dynamics Mission Sys., Inc.*, B-414587, B-414587.2, May 11, 2017, 2017 CPD ¶ 142 at 1. For the reasons set forth above, FEMA respectfully requests that you dismiss Ranger American of Puerto Rico's protest in its entirety.

(emphasis in original). On April 15, 2020, GAO issued a decision which stated, in part: "We dismiss the protest based on the corrective action taken by the agency."

Defendant's cross-motion for judgment on the Administrative Record in this court indicates that after the GAO proceedings:

The contracting officer thereafter reevaluated the proposals and conducted a new best value trade-off analysis based on the SSEB's ratings of the proposals. As with the initial award decision memorandum, in the corrective action award decision memorandum (revised award decision), the contracting officer largely adopted the SSEB's technical findings. In other words, the board did not meet again to conduct a new technical evaluation of AGMA's and Ranger's proposals. The contracting officer, did, however, change Ranger's prior Good rating for past performance (seemingly a typo by the SSEB because it was not an available adjectival rating in the RFP), to Superior. She also modified the score of "4" to "3" for Ranger's past performance, which was the value corresponding to a Superior rating. Ranger's overall numerical rating was thus reduced to "15" from "16."

(internal citations omitted).

On June 15, 2020, the contracting officer issued a Revised Award Decision Memorandum. In the Revised Award Decision Memorandum, the contracting officer again summarized the SSEB's evaluation of AGMA and Ranger American of Puerto Rico:[9]

Offeror 2: AGMA Security Service Inc [sic]                    Rating: Satisfactory

---

[9] As with the initial Award Decision Memorandum, the Revised Award Decision included a summary of the all the offerors, but this Opinion only quotes the evaluation of AGMA and Ranger American of Puerto Rico.

Offeror 2's proposal demonstrated a probability of success to support FEMA's requirement. The offeror had previous experience with FEMA but had no CPARS records. Offeror 2 provided in detail how they would execute the requirement, with a good workplan including a proper transition, good management considering most challenges, and a reasonable Quality Control Plan.

**Factor 1 - Workplan: Good**

Strengths include:

o Demonstrated the ability to make a seamless transition and accounted for the required services. (Section 1: Workplan, page 1, paragraph 2, 6; page 2 paragraph 1, 2; page 3, paragraph 3)

o Proper execution including a detailed description of a proper chain of command and a well-planned timeline (Section 1: Workplan, page 1 paragraphs 3-5, page 2 paragraph 4-6 [sic]

o Offeror demonstrates to have the capability to fulfill the staffing demand in this requirement (footnote page 2).

Weakness include:
o None

Deficiencies include:
o None

**Factor 2 – Project Management Plan: Satisfactory**

Strengths include:

o Demonstrated the ability to effectively manage the contract (Section 2: Project Management Plan in its entirety page 3-4).

o Offeror has a proper plan in place to fulfill staffing island-wide (Section 2: Project Management Plan page 3 paragraphs 5-6).

o Proper assigned supervision (Section 2: Project Management Plan page 4 paragraph 1-5).

o Detailed description of distribution of resources (Section 1: Workplan, page 1 last paragraph, continued page 2 first paragraph and page 2 footnote).

Weakness include:

o None

Deficiencies include:

o None

**Factor 3 – Quality Control Plan: Satisfactory**

Strengths include:

o Offeror has staff designated for Quality Control (Section 3: Quality Control Plan, page 5, paragraph 3).

o Good plan for physical inspections and reporting tools (Section 3, page 5, paragraph 2, 5, 6; page 6 all paragraphs; page 7, paragraphs 1-4).

o Good corrective actions plan Section 3, Paragraph 5-6; page 8, paragraph 1-4).

Weakness include:

o None

Deficiencies include:

o None

**Factor 4 – Past Performance: Neutral**

Strengths include:

o None

Weakness include:

o None

Deficiencies include:

o None

. . .

Offeror 6: Ranger American of Puerto Rico Inc [sic]          Rating: Good

Offeror 6 is the incumbent contractor. They relied on their efficacy to execute the new contract to the "successful" execution of the current contract. The offeror demonstrates the capability to comply with the requirement as established. The offeror demonstrates that they have vast staffing capabilities to meet requirements and beyond. A detailed Project Management Plan was provided. A rigorous training schedule was presented with a good command/field operations structure to complement. Offeror diligently provided the "Use of Force" policy and a sample of physical inspections spreadsheet they use to ensure PSO compliance.

**Factor 1 - Workplan: Good**

Strengths include:

o Offeror references effective modus operandum in current contract (Section: Introduction, page 1, paragraph 6).

o Offeror states a continuation of services would not require a transition (Section 1: Workplan, page 2, paragraph 2).

o Vast staffing capabilities (Section 1, page 2, paragraph 3).

Weakness include:

o None

Deficiencies include:

o None

**Factor 2 – Project Management Plan: Good**

Strengths include:

o Offeror presents in detail the contract management responsibilities, risk avoidance, and insurance of performance making the contract transition a seamless continuity of operations (Section 1: Workplan, page 2, paragraph 3).

o Good command and field operations structure (Section 2: Project Management Plan, subsection Site Leaders, page 5 graph, paragraphs 1-3).

o Contingency plan set in place (Section 2, page 3, paragraph 4).

Weakness include:

o None

Deficiencies include:

o None

### Factor 3 – Quality Control Plan: Good

Strengths include:

o The offeror demonstrates a rigorous Quality Control system in place (Section 3: Quality Control Plan, page 5, paragraph 1-2).

o Quality Control for this offeror includes monitoring processes, field inspections, supporting software, cost control software, reporting capacity, disciplinary strategies, and internal investigations (Section 3, sub-section Technology, page 8, paragraph 1).

o Monitoring documentation developed ensuring compliance (proposal attachment).

o Robust training schedule potentially maximizing quality of work (Section 3, page 6, paragraph 3; and attachment "Training [sic] Manuals protocol).

Weakness include:

o None

Deficiencies include:

o None

### Factor 4 – Past Performance: Good

Strengths include:

o In CPARS, offeror has two evaluations where they are described as "very good" an exceptional in all categories on both.

Weakness include:

o None

Deficiencies include:

o None

(capitalization and emphasis in original).

The Revised Award Decision Memorandum included the following charts reflecting all the offerors:

Table 1

| RATING CHART | | | | | |
|---|---|---|---|---|---|
| Offeror: | Factor 1 | Factor 2 | Factor 3 | Factor 4 | *Overall Factor Rating* |
| Offeror 1: [redacted] | Unsatisfactory | Unsatisfactory | Unsatisfactory | Neutral | **Unsatisfactory** |
| Offeror 2: Agma Security Service Inc. | Good | Satisfactory | Satisfactory | Neutral | **Satisfactory** |
| #3 Offeror 3: [redacted] | Unsatisfactory | Unsatisfactory | Unsatisfactory | Neutral | **Unsatisfactory** |
| Offeror 4: [redacted] | Unsatisfactory | Unsatisfactory | Marginal | Neutral | **Unsatisfactory** |
| Offeror 5: [redacted] | Unsatisfactory | Unsatisfactory | Unsatisfactory | Satisfactory | **Unsatisfactory** |
| Offeror 6: Ranger American | Good | Good | Good | Superior | **Good** |
| Offeror 8: [redacted] | Marginal | Satisfactory | Satisfactory | Satisfactory | **Satisfactory** |
| Offeror 9: [redacted] | Marginal | Marginal | Marginal | Satisfactory | **Marginal** |

26

Table 2

| | EMPIRICAL VALUES RATING CHART | | | | | |
|---|---|---|---|---|---|---|
| *Offeror:* | *Factor 1* | *Factor 2* | *Factor 3* | *Factor 4* | *Total Empirical Value* | *Converted Empirical Value to Overall Rating* |
| #1 | 1 | 1 | 1 | 0 | **3** | Unsatisfactory |
| #2 [AGMA] | 4 | 3 | 3 | 0 | **10** | Satisfactory |
| #3 | 1 | 1 | 1 | 0 | **3** | Unsatisfactory |
| #4 | 1 | 1 | 1 | 0 | **3** | Unsatisfactory |
| #5 | 1 | 1 | 1 | 2 | **5** | Unsatisfactory |
| #6 [Ranger] | 4 | 4 | 4 | 43[10] | **15** | Good |
| #8 | 1 | 3 | 3 | 2 | **9** | Satisfactory |
| #9 | 1 | 1 | 1 | 2 | **5** | Marginal |

Table 3

| RATING CHART BREAKDOWN | | | |
|---|---|---|---|
| *Factors 1 - 3* | *Numerical Rating* | *Factor 4* | *Numerical Rating* |
| Superior | 5 | | |
| Good | 4 | Superior | 3 |
| Satisfactory | 3 | Satisfactory | 2 |
| Marginal | 1 | Unsatisfactory | 1 |
| Unsatisfactory | 1 | Neutral | 0 |

Table 4

| OVERALL RATING RANGE | |
|---|---|
| *Overall Rating* | *Rating Range* |
| Superior | 18 |
| Good | 14 to 17 |
| Satisfactory | 10 to 13 |
| Marginal | 6 to 10 |
| Unsatisfactory | 3 to 5 |

(all capitalization and emphasis for all charts in original; brackets added). Regarding Price, the contracting officer indicated:

> Based on the comparative analysis of the Base and Option Year 1, the lowest priced offeror, AGMA's, proposed price of $[redacted] was [ ]% lower

---

[10] As explained below, defendant and intervenor assert that the number 43 was a "typographical error."

27

than the IGCE [Independent Government Cost Estimate]. The highest priced offeror, Ranger's, proposed price of $[redacted] was within $[redacted] of the IGCE. Price reasonableness was based off adequate competition, comparison to the revised independent government cost estimate of $[redacted] and historical data.

For the best value trade-off analysis, the contracting officer stated:

Of the nine offerors, four received technical ratings higher than Unsatisfactory. Of those, Ranger had the best technical proposal with an overall rating of Good, while AGMA had an overall rating of Satisfactory but offered the lowest price.

For the Work Plan (Factor 1), both AGMA and Ranger submitted proposals that met the minimum solicitation requirement, and both were rated Good for this factor. The TET determined that both AGMA and Ranger were found to be technically equivalent in this area.

For the Project Management Plan (Factor 2), both AGMA and Ranger met the minimum solicitation requirement. AGMA's proposal demonstrated a plan in place to fulfill staffing island wide, proper assigned supervision and a detailed description of distribution of resources. AGMA received a rating of Satisfactory. Ranger's proposal demonstrated a detailed understanding of the contract management responsibilities, risk avoidance, and insurance of performance making the contract transition a seamless continuity of operations, as well as good command and field operations structure and a contingency plan in place. Ranger received a rating of Good.

For Factor 3, AGMA's proposed Quality Control Plan demonstrates a staff designated for quality control, a good plan for physical inspections and reporting tools and a good corrective action plan. Ranger's demonstrates a rigorous quality control system in place, monitoring processes, field inspections, supporting software, cost control software, reporting capacity, disciplinary strategies, and internal investigations; and robust training schedule potentially maximizing quality of work. Ranger received a rating of Good. For the Past Performance factor, Ranger received a rating of Superior and AGMA received a rating of Neutral. Neither offerors have known past performance issues. Both Ranger and AGMA proposals met the minimum solicitation technical requirements. Overall, AGMA and Ranger were determined to be technically equivalent with regards to Work Plan, but Ranger's Project Management Plan and Quality Control Plan were both technically superior to AGMA's. Ranger received a Past Performance rating of Superior, while AGMA received a Past Performance rating of Neutral. Ranger received an overall rating of Good, while AGMA received an overall rating of Satisfactory. However, AGMA's proposed price was lower than Rangers. [sic]

| Offeror Name | Overall Rating | Total Award Amount |
|---|---|---|
| AGMA | Satisfactory | $[redacted] |
| Ranger | Good | $[redacted] |
|  |  |  |

The Solicitation stated that technical factors would be more important than price. Offeror 6 (Ranger) had a 50% higher technical score than AGMA and only a [redacted]% higher price. Ranger had a higher rating with regard to the Project Management Plan, Quality Control Plan, and Past Performance. While Offeror 2's (AGMA) proposal was perfectly adequate, Offeror 6's (Ranger) was significantly better.

For the award decision, the contracting officer concluded:

Based on the integrated assessment of all proposals in accordance with the specified evaluation factors, it is hereby recommended that the award be made to Ranger under contract No. 70FBR220C00000019. Ranger's proposal is significantly stronger and offers the best-valued solution to the Government, and the price is determined to be fair and reasonable.

The same day the contracting officer issued the Revised Award Decision Memorandum, June 15, 2020, the contracting officer made the award to Ranger American of Puerto Rico. On June 23, 2020, FEMA terminated for convenience AGMA's previously awarded contract, after the contracting officer awarded the contract to Ranger American of Puerto Rico. As indicated in protestor's complaint in this court, on June 23, 2020, "FEMA issued Modification No. 2 to the AGMA Contract, terminating it for convenience."[11] On July 1, 2020, FEMA sent AGMA a debriefing letter. The July 1, 2020 AGMA debriefing letter stated that "[t]he technical and past performance evaluations did not change as a result of the corrective action in this matter." The July 1, 2020 AGMA debriefing letter also explained:

The Solicitation stated that technical factors would be more important than price. Offeror 6 (Ranger) had a 50% higher technical score than AGMA and only a [redacted]% higher price. Ranger had a higher rating with Quality Control Plan, and Past Performance. While Offeror 2's (AGMA) proposal was perfectly adequate, Offeror 6's (Ranger) was significantly better. The basis of award for the contract is a best value determination based on technical, past performance and price. Technical and past performance

---

[11] Modification No. P0002 stated in part: "This [sic] purpose of this Modification Number P0002 hereby completely terminates subject contract for the convenience of the Government pursuant to FAR 52.249-2 as a result of the corrective action after the protest."

when combined, are more important than price. The Government evaluated your technical and past performance and conducted a price analysis. Because the technical evaluation was more important than price, it was determined that Ranger's proposal was the best value to the government in accordance with the Solicitation.

In response to the award to Ranger American of Puerto Rico, protestor filed a post-award bid protest in this court, as well as a motion for injunctive relief. The complaint alleges that "FEMA improperly accepted Ranger's certification as a local firm, and FEMA should have rejected Ranger's proposal on this basis. This action was a violation of the Stafford Act and FAR Subpart 26.2 provisions regarding local-firm set-asides, related procurement law and the APA." In addition, protestor contends in this court that "after Ranger's protest, FEMA improperly reevaluated the Ranger and AGMA proposals, and decided to terminate the AGMA Contract and make award to Ranger." Therefore, protestor contends that FEMA's award to Ranger American of Puerto Rico "was arbitrary, capricious, an abuse of discretion, contrary to law and without the procedures required by law." Protestor requests that the court declare "that the award of the Ranger Contract was and is contrary to law," and should issue an order "[e]njoining any performance of the Ranger Contract, and directing that it be terminated for convenience," as well as "[d]irecting that the agency reinstate the AGMA Contract, or issue a new contract to AGMA in accordance with the terms of the Solicitation."

Defendant and intervenor responded to the motion for injunctive relief and filed cross-motions for judgment on the Administrative Record.[12] Regarding the Stafford Act, defendant argues that the "RFP required offerors to represent they were a local firm primarily doing business in Puerto Rico, and the contracting officer was not required to undertake further analysis." Defendant also argues that "[t]he contracting officer's revised award memorandum is supported by substantial evidence and in accordance with law." Intervenor contends that regarding the protestor's Stafford Act arguments, protestor ignores "the Ranger PR proposal and information known to FEMA through Ranger PR's incumbent contract, and AGMA otherwise relies on an unreasonable interpretation of the RFP and FAR contrary to all canons of interpretation." Additionally, intervenor contends that "FEMA reasonably determined Ranger PR met the requirements and was an offeror that resides or primarily does business in the designated set-aside area." Furthermore, intervenor argues "[r]egarding any challenge to the post-corrective action best-value determination: (a) the Court affords FEMA substantial deference; (b) FEMA met its

---

[12] The court notes the unusual procedural history in this protest, as defendant and intervenor filed cross-motions for judgment on the Administrative Record even though protestor did not file an initial motion for judgment on the Administrative Record, but only a motion for injunctive relief. Interestingly, protestor's reply to its motion for injunctive relief is titled: "Plaintiff's reply in support of its motion for judgment on the Administrative Record and permanent injunction, and injunction to Defendant [sic] and Intervenor [sic] motions for judgment on the Administrative Record." Although protestor did not file a motion for judgment on the Administrative Record, the court nevertheless refers to defendant's and intervenor's motions in the same way as the parties refer to the motions.

burden to document and explain its decision; and (c) the determination was consistent with the RFP."

## DISCUSSION

<u>The Stafford Act</u>

Protestor argues that the award to intervenor should be "enjoined for failure to observe the required Stafford Act procedure." In its complaint, protestor alleged that "FEMA improperly accepted Ranger's certification as a local firm, and FEMA should have rejected Ranger's proposal on this basis. This action was a violation of the Stafford Act and FAR Subpart 26.2 provisions regarding local-firm set-asides, related procurement law and the APA." Defendant responds that the "RFP required offerors to represent they were a local firm primarily doing business in Puerto Rico, and the contracting officer was not required to undertake further analysis." Intervenor argues that protestor's arguments "ignore the Ranger PR proposal and information known to FEMA through Ranger PR's incumbent contract, and AGMA otherwise relies on an unreasonable interpretation of the RFP and FAR contrary to all canons of interpretation." According to intervenor, "FEMA reasonably determined Ranger PR met the requirements and was an offeror that resides or primarily does business in the designated set-aside area."

As explained by a Judge of the United States Court of Federal Claims:

The Stafford Act provides, in pertinent part:

> In the expenditure of Federal funds for debris clearance, distribution of supplies, reconstruction, and other major disaster or emergency assistance activities which may be carried out by contract or agreement with private organizations, firms, or individuals, preference shall be given, to the extent feasible and practicable, to those organizations, firms and individuals residing or doing business primarily in the area affected by such major disaster or emergency.

42 U.S.C. § 5150(a)(1). Substantially the same language appears in the FAR, which requires the defendant to apply the Stafford Act preference "when awarding emergency response contracts," either through a local area set aside or as an evaluation preference.

<u>Crewzers Fire Crew Transport, Inc. v. United States</u>, 98 Fed. Cl. 71, 82 (2011) (quoting FAR 26.202) (emphasis removed).[13] The current version of 42 U.S.C. § 5150(a)(1) is the

---

[13] The current version of FAR 26.202(a) (2019) retains the same language and states in full:

> When awarding emergency response contracts during the term of a major disaster or emergency declaration by the President of the United States

same as quoted above in <u>Crewzers Fire Crew Transport, Inc. v. United States</u>. The full text of 42 U.S.C. § 5150, titled: "Use of local firms and individuals," provides:

**(a) Contracts or agreements with private entities**

**(1) In general**
In the expenditure of Federal funds for debris clearance, distribution of supplies, reconstruction, and other major disaster or emergency assistance activities which may be carried out by contract or agreement with private organizations, firms, or individuals, preference shall be given, to the extent feasible and practicable, to those organizations, firms, and individuals residing or doing business primarily in the area affected by such major disaster or emergency.

**(2) Construction**
This subsection shall not be considered to restrict the use of Department of Defense resources under this chapter in the provision of assistance in a major disaster.

**(3) Specific geographic area**
In carrying out this section, a contract or agreement may be set aside for award based on a specific geographic area.

**(b) Implementation**

**(1) Contracts not to entities in area**
Any expenditure of Federal funds for debris clearance, distribution of supplies, reconstruction, and other major disaster or emergency assistance activities which may be carried out by contract or agreement with private organizations, firms, or individuals, not awarded to an organization, firm, or individual residing or doing business primarily in the area affected by such major disaster shall be justified in writing in the contract file.

**(2) Transition**
Following the declaration of an emergency or major disaster, an agency performing response, relief, and reconstruction activities shall transition work performed under contracts in

---

under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. [§] 5121, et seq.), preference shall be given, to the extent feasible and practicable, to local firms. Preference may be given through a local area set-aside or an evaluation preference.

FAR 26.202(a) (brackets added).

effect on the date on which the President declares the emergency or major disaster to organizations, firms, and individuals residing or doing business primarily in any area affected by the major disaster or emergency, unless the head of such agency determines that it is not feasible or practicable to do so.

**(3) Formulation of requirements**
The head of a Federal agency, as feasible and practicable, shall formulate appropriate requirements to facilitate compliance with this section.

**(c) Prior contracts**

Nothing in this section shall be construed to require any Federal agency to breach or renegotiate any contract in effect before the occurrence of a major disaster or emergency.

42 U.S.C. § 5150 (emphasis in original).

As noted by the parties, a number of provisions in the FAR address the Stafford Act. Relevant to the allegations raised by protestor, FAR 18.203(a) states that for disaster or emergency assistance activities, "[p]reference will be given to local organizations, firms, and individuals when contracting for major disaster or emergency assistance activities when the President has made a declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act. Preference may take the form of local area set-asides or an evaluation preference." FAR 18.203(a) (2019).[14] As noted above, FAR 26.202, "Local area preference" provides:

(a) When awarding emergency response contracts during the term of a major disaster or emergency declaration by the President of the United States under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. [§] 5121, et seq.), preference shall be given, to the extent feasible and practicable, to local firms. Preference may be given through a local area set-aside or an evaluation preference.

FAR 26.202(a) (2019) (brackets added). FAR 26.202-1, "Local area set-aside," provides:

The contracting officer may set aside solicitations to allow only local firms within a specific geographic area to compete (see 6.208[15]).

---

[14] Pursuant to FAR 26.201: "Local firm means a private organization, firm, or individual residing or doing business primarily in a major disaster or emergency area." FAR 26.201 (2019).

[15] FAR 6.208 addresses "[s]et-asides for local firms during a major disaster or emergency," and states:

(a) The contracting officer, in consultation with the requirements office, shall define the specific geographic area for the local set-aside.

(b) A major disaster or emergency area may span counties in several contiguous States. The set-aside area need not include all the counties in the declared disaster/emergency area(s), but cannot go outside it.

(c) The contracting officer shall also determine whether a local area set-aside should be further restricted to small business concerns in the set-aside area (see Part 19).

FAR 26.202-1 (2019).[16]

FAR 52.226-3, "Disaster or Emergency Area Representation," states:

As prescribed in 26.206(a), insert the following provision:

Disaster or Emergency Area Representation (NOV 2007)

---

(a) To fulfill the statutory requirements relating to 42 U.S.C. [§] 5150, contracting officers may set aside solicitations to allow only offerors residing or doing business primarily in the area affected by such major disaster or emergency to compete (see Subpart 26.2).

(b) No separate justification or determination and findings is required under this part to set aside a contract action. The set-aside area specified by the contracting officer shall be a geographic area within the area identified in a Presidential declaration(s) of major disaster or emergency and any additional geographic areas identified by the Department of Homeland Security.

FAR 6.208 (2019) (brackets added).

[16] FAR 26.204, "Justification for expenditures to other than local firms," states:

(a) 42 U.S.C. [§] 5150(b)(1) requires that, subsequent to any Presidential declaration of a major disaster or emergency, any expenditure of Federal funds, under an emergency response contract not awarded to a local firm, must be justified in writing in the contract file. The justification should include consideration for the scope of the major disaster or emergency and the immediate requirements or needs of supplies and services to ensure life is protected, victims are cared for, and property is protected.

(b) The justification may be made on an individual or class basis. The contracting officer approves the justification.

FAR 26.204 (2019) (brackets added).

(a)  Set-aside  area.  The  area  covered  in  this  contract  is:  _____ [Contracting Officer to fill in with definite geographic boundaries.]

(b) Representations. The offeror represents that it __ does __ not reside or primarily do business in the set-aside area.

(c) An offeror is considered to be residing or primarily doing business in the set-aside area if, during the last twelve months—

   (1) The offeror had its main operating office in the area; and

   (2) That office generated at least half of the offeror's gross revenues  and  employed  at  least  half  of  the  offeror's permanent employees.

(d) If the offeror does not meet the criteria in paragraph (c) of this provision, factors  to  be  considered  in  determining  whether  an  offeror  resides  or primarily does business in the set-aside area include—

   (1)  Physical  location(s)  of  the  offeror's  permanent  office(s) and date any office in the set-aside area(s) was established;

   (2) Current state licenses;

   (3) Record of past work in the set-aside area(s) (e.g., how much and for how long);

   (4) Contractual history the offeror has had with subcontractors and/or suppliers in the set-aside area;

   (5) Percentage of the offeror's gross revenues attributable to work performed in the set-aside area;

   (6) Number of permanent employees the offeror employs in the set-aside area;

   (7) Membership in local and state organizations in the set-aside area; and

   (8)  Other  evidence  that  establishes  the  offeror  resides  or primarily does business in the set-aside area. For example, sole  proprietorships  may  submit  utility  bills  and  bank statements.

(e) If the offeror represents it resides or primarily does business in the set-aside  area,  the  offeror  shall  furnish  documentation  to  support  its

representation if requested by the Contracting Officer. The solicitation may require the offeror to submit with its offer documentation to support the representation.

FAR 52.226-3 (2019) (capitalization in original). FAR 52.226-4, "Notice of Disaster or Emergency Area Set-Aside," states:

> As prescribed in 26.206(b), insert the following clause:
>
> Notice of Disaster or Emergency Area Set–Aside (NOV 2007)
>> (a) Set-aside area. Offers are solicited only from businesses residing or primarily doing business in _____ [Contracting Officer to fill in with definite geographic boundaries.] Offers received from other businesses shall not be considered.
>> (b) This set-aside is in addition to any small business set-aside contained in this contract.

FAR 52.226-4 (capitalization in original). The language of FAR 52.226-4 was adapted to meet the requirements of the RFP and the RFP stated:

> (a) Set-aside area. Offers are solicited only from businesses residing or primarily doing business in Puerto Rico (all municipalities). Offers received from other businesses shall not be considered.
> (b) This set-aside is in addition to any small business set-aside contained in this contract.

Protestor argues that "[t]he Stafford Act restricts certain FEMA contract awards to 'local firms,' as that term is defined in the Act and its associated regulations and contract clauses," and that "Ranger, apparently acting through two subsidiaries, has received 'local firm' contract awards from FEMA for both Puerto Rico and the Virgin Islands, at the same time," in violation of the Stafford Act. Protestor continues, "Ranger's proposal for this Puerto Rico local set-aside is replete with *dozens* of references to Ranger's work in the Virgin Islands, Ranger actually touts the interweaving of its Puerto Rico and Virgin Islands operations, and Ranger freely refers to the Ranger Virgin Islands subsidiary as its 'affiliate.'"[17] (emphasis in original). As it relates to the above captioned protest, protestor contends:

> FEMA is *required* to make two threshold determinations:
> (c) An offeror is considered to be residing or primarily doing business in the set-aside area if, during the last twelve months-

---

[17] In response to this argument, intervenor states that "AGMA fails to cite provisions of the Stafford Act or FAR 52.226-3 and -4, which implement the Act, prohibiting an offeror from referencing in its proposal work in different localities or performing work in different localities. The Ranger PR proposal thoroughly demonstrates Ranger PR, the offeror here, resides in Puerto Rico." (internal reference omitted).

(1) The offeror had its main operating office in the area; and
(2) That office generated at least half of the offeror's gross revenues and employed at least half of the offeror's permanent employees.
FAR 52.226-3(c). If an offeror fails either of these two tests, then FEMA can consider other evidence under FAR 52.226-3(d)(1)-(8). But here, the Stafford Act process never reached that point, because Ranger didn't provide the information, FEMA didn't follow up on this, and FEMA never made the necessary determination.

(emphasis in original; footnote omitted).

As noted above, Ranger American of Puerto Rico's proposal reflected the framework of FAR 52.226-3 and the RFP, and Ranger American of Puerto Rico's proposal indicated:

2. Representations, Certifications & Other Statements of Offers

a. Disaster or Emergency Area Representation (Nov 2007)

(a)      Set-aside area. The area covered in this contract is the entire island of Puerto Rico including municipalities of Vieques and Culebra.

(b)      Representations. The offeror represents that it [ **X** ] does [ ] does not reside or primarily do business in the set-aside area.
*(PARAGRAPH (b) OF THE ABOVE CLAUSE MUST BE COMPLETED AND SUBMITTED WITH YOUR QUOTE)*
b. Offeror Representations and Certifications-Commercial Items
b. Ranger American has completed the annual representations and certifications electronically in SAM accessed through http://www.sam.gov. After reviewing SAM information, the Offeror verifies by submission of this offer that the representations and certifications currently posted electronically at FAR 52.212-3, Offeror Representations and Certifications-Commercial Items, have been entered or updated in the last 12 months, are current, accurate, complete, and applicable to this solicitation (including the business size standard applicable to the NAICS code referenced for this solicitation), at the time this offer RFP#: 70FBR220R00000002 Continuation of any block from the SF 1449 74 is submitted and are incorporated in this offer by reference (see FAR 4.1201), except for paragraphs.

(all capitalization, emphasis, and highlight in original).

Intervenor Ranger American of Puerto Rico argues that "FEMA's determination that Ranger PR met the RFP's Stafford Act locality provision as a local contractor in Puerto Rico was reasonable. Ranger PR provided numerous certifications evidencing its status as a long-standing contractor that has resided in Puerto Rico since April 2, 1982," and "Ranger PR provided a map reflecting availability of its security officers throughout Puerto Rico, and confirmed its 48,000 square foot headquarters is in Puerto Rico." Included as an appendix to Ranger American of Puerto Rico's proposal were the following documents:

- Certificate of Incorporation
- Certificate of Existence
- Certificate of Good Standing
- Private Detectives Agency License
- Safety Agency License
- Total Waiver Certificate
- Municipal Patent
- Merchant Registration Certificate
- ASG - Eligibility Certificate
- CRIM - Personal Property Tax Certificate
- CRIM - Statement of Account
- CRIM - Negative Certification of Property
- CRIM - Certification for all concepts
- Hacienda IVU - Certificate of Debts (Electronic Validation included)
- Hacienda IVU - Tax Certification (Electronic Validation included)
- Hacienda - Tax Contribution Certification
- Hacienda - Certificate of Debts
- Municipal Patent - Certificate of Debts
- ASUME - Certificate of Compliance Status
- CFSE - Certificate of Insurance
- CFSE - Certificate of Debts
- Labor Department
  o Certificate of Drivers Insurance Program
  o Certificate of Unemployment & Disability Insurance

In addition, in Ranger American of Puerto Rico's proposal, consistent with FAR 52.226-3, "Disaster or Emergency Area Representation," intervenor represented that it does reside or primarily does business in the set-aside area. Regarding protestor's claims that Ranger American of Puerto Rico, "apparently acting through two subsidiaries," has received local firm set-asides in "violation of the Stafford Act," Ranger American of Puerto Rico contends that "[n]othing in the Stafford Act or the FAR provisions implementing the Act requires, or permits, an agency to consider an offeror's affiliates. Stated differently, the residency of any Ranger PR affiliate, including Ranger VI, is irrelevant to whether Ranger PR, the offeror here, resides or primarily conducts business in Puerto Rico."

The court notes that the offeror listed on intervenor's proposal is "Ranger PR."[18] As intervenor notes, "AGMA admits in its Complaint that Ranger PR was the offeror for this procurement." The FAR provisions that AGMA relies on FAR 52.226-3 and FAR 52.226-4 simply refer to "offeror" and, as Ranger American of Puerto Rico notes in its cross-motion for judgment on the Administrative Record, "[n]othing in the Stafford Act or the FAR provisions implementing the Act requires, or permits, an agency to consider an

_____

[18] Intervenor's proposal also indicates it is from "Ranger American" that "'RANGER AMERICAN' collectively refers to Ranger American of Puerto Rico and the following affiliated companies: [redacted]; Ranger American of the Virgin Islands; [redacted]; [redacted]; and [redacted]." (capitalization in original).

offeror's affiliates. Stated differently, the residency of any Ranger PR affiliate, including Ranger VI, is irrelevant to whether Ranger PR, the offeror here, resides or primarily conducts business in Puerto Rico." To Ranger American of Puerto Rico's point, neither the Stafford Act, nor the relevant FAR provisions quoted above, use the word affiliate.

Defendant notes that "AGMA repeatedly conflates Ranger[19] and Ranger V.I. as one and the same company and argues that one company cannot be a 'local firm' in two separate jurisdictions, the Virgin Islands and Puerto Rico. But Ranger [Ranger American of Puerto Rico] and Ranger V.I. are *two separate companies* and there is no record support to conclude otherwise." (emphasis in original; internal reference omitted). In essence, protestor assumes the two entities, Ranger American of Puerto Rico and Range V.I., are the same company, without offering proof to the contrary.

Ranger American of Puerto Rico, represented in its proposal that the entity of Ranger American of Puerto Rico does reside or primarily does business in the set-aside area, and further represented that Ranger American of Puerto Rico submitted the required documentation, and met its obligations to establish eligibility for the contract in Puerto Rico. Defendant notes that "in no less than three places, Ranger represented that it was incorporated under the laws of the Commonwealth of Puerto Rico in 1982, close to 40 years ago," and argues that "AGMA ignores the financial statements that Ranger submitted as part of its proposal, the commercial and government certifications, and its technical and business proposals." (footnote and internal references omitted). Indeed, AGMA offers nothing to contradict that Ranger American of Puerto Rico made those representations to FEMA in the procurement at issue. Furthermore, nothing in the record before the court contradicts Ranger American of Puerto Rico's representations. AGMA's unsubstantiated claims to the contrary are not sufficient to demonstrate Ranger American of Puerto Rico did not comply with the Stafford Act and its implementing regulations, or the requirements of the RFP, or that FEMA did not act in compliance with the Stafford Act.

Protestor also cites to the GAO decision in Falken USVI, LLC. See Falken USVI, LLC, B-416581.2, 2019 WL 157737 (Comp. Gen. 2019). Protestor argues that in Falken, "Ranger American went so far as to protest an award to a Virgin Islands competitor on the basis that because of affiliates, that competitor was not 'doing business primarily' in the Virgin Islands." Using strong language, protestor contends,

19 The court notes that defendant defined "Ranger" in its filings as "Ranger American of Puerto Rico, Inc." Protestor at times in its filings also refers to "Ranger American of Puerto Rico, Inc." as "Ranger," or "Ranger P.R." Given the different corporate entities with the name Ranger involved in the above captioned protest, the court finds that the lack of precision in the briefs troubling and results in confusion in some of the arguments. Except in quotations, the court uses the name the intervenor used in its filings: "Ranger American of Puerto Rico." The court does, however, note, that the certificate of incorporation and the certificate of existence in the appendix to Ranger American of Puerto Rico's proposal, and included in the Administrative Record, refer to the entity as "Ranger American of Puerto Rico, Inc." Regarding Ranger American of the Virgin Islands, Inc., all parties use the same abbreviation: "Ranger V.I." or "Ranger VI."

Ranger thus is engaging in two-faced, two-timing, double-dealing duplicity here, by certifying itself as a local firm in both Puerto Rico and in the Virgin Islands, through affiliated entities. This undermines the central purpose of Stafford Act local-firm set-asides. Moreover, with Ranger having argued that Falken was disqualified from Virgin Islands local-firm set-asides because of affiliation, Ranger is estopped from claiming anything different here.

Regarding Falken, Ranger American of Puerto Rico contends that "AGMA misstates the basis for the protest by Ranger VI, a different company than Ranger PR. The AR [Administrative Record] lacks any evidence that Ranger PR – or an affiliate – has ever argued 'affiliates must be considered when FEMA makes a Stafford Act local-firm determination.'" (brackets added).

The court notes that despite protestor's overheated rhetoric, the rationale for the GAO to conclude Falken had not met the requirements under the Stafford Act was far more nuanced. The GAO decision in Falken stated, in part:

> With respect to Falken, the contracting officer concluded that the firm did not provide sufficient evidence to demonstrate that it resides or primarily does business in the set-aside area pursuant to FAR provision 52.226–3(d). AR, Tab U, Falken Final Locality Determination, at 1, 5. In this regard, the contracting officer noted that Falken identified two operating offices in the U.S. Virgin Islands, a St. Croix location established in October 2017, and a St. Thomas location established in February 2018, with a total of 113 permanent employees in the two locations. *Id.* at 1–4. The contracting officer also noted that Falken's licenses were not issued until October 2017 after the company's establishment in the U.S. Virgin Islands on October 13, 2017. *Id.* at 2. The contracting officer further stated that while Falken identified contracts it had entered into with businesses in the U.S. Virgin Islands, these contracts did not establish a history of local business relationships because all of the contracts arose within the last five months and were for small dollar amounts. *Id.* at 2–3. With respect to gross revenues, the contracting officer also concluded that the information provided did not demonstrate what portion of Falken's gross revenues were attributable to work performed in the set-aside area. *Id.* at 3. Moreover, the contracting officer found that most if not all of Falken's revenues in the set-aside area were from a FEMA contract awarded to Falken in February 2018. *Id.* Based on this information, the contracting officer concluded that Falken Industries is a "15 year old Virginia based company that set up a temporary, post-disaster operation in the U.S. Virgin Islands." *Id.* at 4.

Falken USVI, LLC, B-416581.2, 2019 WL 157737, at *5 (emphasis in original). Ranger American of Puerto Rico notes that the entity at issue in Falken was not Ranger American

of Puerto Rico, the offeror in this protest and the procurement was unrelated to this procurement.[20]

In the protest before this court, in addition to questioning Ranger American of Puerto Rico's status to be qualified as a local business, AGMA contends that "FEMA improperly accepted Ranger's certification as a local firm, and FEMA should have rejected Ranger's proposal on this basis. This action was a violation of the Stafford Act." Defendant responds that "both the FAR and the terms of the solicitation allow a company to self-represent as local, so long as it also submits the documentation, which both Ranger and AGMA did here. AGMA points to no case law, nor are we aware of any, that a contracting officer must make a written Stafford Act locality determination." Further, defendant argues,

> to put a finer point on AGMA's argument, AGMA presumably argues that a FEMA contracting officer should not accept a company's representation as to its eligibility to perform local business in a disaster zone, and, instead, should independently determine whether a company is "local," where a company has affiliates that are qualified as local in other jurisdictions. Such an interpretation of the "spirit" of the Stafford Act is not only untenable, but also unworkable.

(internal reference omitted). The court agrees that AGMA's reading of the Stafford Act and FAR would impose a burden on the agency that is not present in the Stafford Act, nor in the regulations. Protestor's suggestions that FEMA should not accept an offeror's representation with respect to Stafford Act eligibility, but must also verify that each offeror is a local firm, is not required of the agency. FAR 52.226-3 requires the offeror to make representations and submissions that meet the requirement of local firm status and FEMA may rely on the offeror's representation. Neither the contracting officer nor another FEMA representative for the procurement at issue in this protest was obligated to independently verify an offeror's status as qualifying as a local firm. To conclude otherwise would read out the self-representation available to offerors under FAR 52.226-3. In sum, Ranger American of Puerto Rico's representations were sufficient to meet the requirements of the Stafford Act and FEMA acted reasonably to rely on those representations, despite the colorful rhetoric without evidentiary substantiation offered by AGMA.

Finally, the court notes that this procurement evidences how the Stafford Act still operates as intended in a procurement, despite protestor's insinuations that defendant's

---

[20] Intervenor Ranger American of Puerto Rico also notes in a separate <u>Falken</u> matter,

> Ranger VI argued, among other things, the actual offeror (Falken) had its "main operating office . . . in Virginia, rather than St. Thomas. <u>See</u> <u>Ranger American of the Virgin Islands, Inc.</u>, 2020 WL 3447749, at *5. The protest challenged that the *offeror itself* – not a purported "affiliate" – had its "main operating office . . . in Virginia."

(emphasis in original).

and intervenor's interpretation of the Stafford Act and the regulations would render the Stafford Act toothless. As explained by the SSEB: "During the initial screening, Offeror 7 [redacted] was deemed ineligible for award. Offeror does not reside or primarily doing [sic] business in the disaster area in accordance with FAR 52.226-3 Disaster or Emergency Area Representation and therefore were not evaluated." FEMA reviewed the [redacted] proposal, and determined that [redacted] was not eligible for award because the company did not reside or did not primarily do business in the disaster area, and, therefore, did not evaluate the proposal further.

FEMA's Corrective Action Evaluation

Based on the record before the court, having determined that the Stafford Act was not violated with respect to Ranger American of Puerto Rico, the court turns to the protestor's arguments regarding FEMA's actions after the corrective action. Protestor argues in its motion for injunctive relief, "after Ranger's protest, FEMA improperly reevaluated the Ranger and AGMA proposals, and decided to terminate the AGMA Contract and make award to Ranger. Specifically, FEMA not only improperly reversed its original best-value judgment, but it also: (a) employed an undisclosed, irrational and misapplied evaluation scheme;" and "(b) improperly evaluated past performance and the quality control plan." In its cross-motion for judgment on the Administrative Record, defendant argues that "[t]he contracting officer's revised award memorandum is supported by substantial evidence and in accordance with law."

Rule 52.1(c)(1) (2020) of the Rules of the United States Court of Federal Claims (RCFC) governs motions for judgment on the administrative record. The court's inquiry is directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" Mgmt. & Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006); see also Superior Optical Labs, Inc. v. United States, 2020 WL 6375739, at *7 (Fed. Cl. Oct. 21, 2020) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005)); AAR Manufacturing, Inc. v. United States, 149 Fed. Cl. 514, 522 (2020); Glocoms, Inc. v. United States, 149 Fed. Cl. 725, 731 (2020); Centerra Grp., LLC v. United States, 138 Fed. Cl. 407, 412 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1356-57); Informatics Applications Grp., Inc. v. United States, 132 Fed. Cl. 519, 524 (2017) (citation omitted); Strategic Bus. Sols., Inc. v. United States, 129 Fed. Cl. 621, 627 (2016), aff'd, 711 F. App'x 651 (Fed. Cir. 2018); Pursuant to RCFC 52.1, in a bid protest, the court reviews the agency's procurement decision to determine whether it is supported by the administrative record. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 481 (2013); see also CR/ZWS LLC v. United States, 138 Fed. Cl. 212, 223 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1353-54).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001); see also Sys. Application & Techs., Inc.

v. United States, 691 F.3d 1374, 1380 (Fed. Cir. 2012) (explaining that the Tucker Act expressly waives sovereign immunity for claims against the United States in bid protests). The statute provides that protests of agency procurement decisions are to be reviewed under APA standards, making applicable the standards outlined in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016) ("Protests of agency procurement decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), see 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), 'by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'" (quoting NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) (citing PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010))); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332; Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir.) (citing Scanwell Labs., Inc. v. Shaffer, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"), reh'g denied (Fed. Cir. 2004). In Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345 (Fed. Cir. 2004), the Federal Circuit explained that "[u]nder the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" Id. at 1351 (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); see also Palantir USG, Inc. v. United States, 904 F.3d 980, 990 (Fed. Cir. 2018); AgustaWestland North Am., Inc. v. United States, 880 F.3d 1326, 1332 (Fed. Cir. 2018); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319.

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). See Croman Corp. v. United States, 724 F.3d 1357, 1363 (Fed. Cir.) ("'[T]he proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (alterations in original) (quoting Banknote Corp. of Am. v. United States, 365 F.3d at 1350-51 (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir.), reh'g denied (Fed. Cir. 2000)))), reh'g and reh'g en banc denied (Fed. Cir. 2013). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2018);[21] see also Veterans

---

[21] The language of 5 U.S.C. § 706 provides in full:

Contracting Grp., Inc. v. United States, 920 F.3d 801, 806 (Fed. Cir. 2019) ("In a bid protest, we follow Administrative Procedure Act § 706 and set aside agency action 'if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting Palladian Partners, Inc. v. United States, 783 F.3d 1243, 1252 (Fed. Cir. 2015)); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); and Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285-86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381 (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review

---

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

    (1) compel agency action unlawfully withheld or unreasonably delayed; and

    (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

        (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

        (B) contrary to constitutional right, power, privilege, or immunity;

        (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

        (D) without observance of procedure required by law;

        (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

        (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000)." (internal citations omitted)); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Synergy Sols., Inc. v. United States, 133 Fed. Cl. 716, 734 (2017) (citing Banknote Corp. of Am. v. United States, 365 F.3d at 1350); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d at 1351), reh'g en banc denied (Fed. Cir. 2011); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 ("In applying this [arbitrary and capricious] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure." (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1285-86)); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); McVey Co., Inc. v. United States, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531-32 ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)), subsequent determination, 96 Fed. Cl. 119 (2010).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ."); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285-86 (2006), appeal dismissed sub nom. Textron, Inc.

v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 990 (Fed. Cir. 2018); Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)); Synergy Sols., Inc. v. United States, 133 Fed. Cl. at 735 (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33). "'"If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."'" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); Limco Airepair, Inc. v. United States, 130 Fed. Cl. 544, 550 (2017) (citation omitted); Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 631 (2014); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013); Norsat Int'l [America], Inc. v. United States, 111 Fed. Cl. 483, 493 (2013); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 780 (2011).

Stated otherwise by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (internal citations omitted), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6-7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" standard, the Federal Circuit stated: "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of

the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applied here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); ); Sys. Studies & Simulation, Inc. v. United States, 146 Fed. Cl. 186, 199 (2019); By Light Prof'l IT Servs., Inc. v. United States, 131 Fed. Cl. 358, 366 (2017); BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (internal citations omitted) (quoting Keeton Corrs., Inc. v. United States, 59 Fed. Cl. 753, 755, recons. denied, 60 Fed. Cl. 251 (2004); and Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381)), appeal dismissed, 559 F. App'x 1033 (Fed. Cir. 2014); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. at 382; Alamo Travel Grp., LP v. United States, 108 Fed. Cl. 224, 231 (2012); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002).

According to the United States Court of Appeals for the Federal Circuit:

Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958-59; see also Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting Tyler Constr. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), reh'g en banc denied (Fed. Cir. 2014); Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995 (Fed. Cir. 1996); Geo-Med, LLC v. United States, 126 Fed. Cl. 440, 449 (2016); Cybertech Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); Furthermore, according to the United States Court of Appeals for the Federal Circuit:

Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324,

1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

PAI Corp. v. United States, 614 F.3d at 1351; see also AgustaWestland N. Am., Inc. v. United States, 880 F.3d at 1332 ("Where, as here, a bid protester challenges the procurement official's decision as lacking a rational basis, we must determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion,' recognizing that 'contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33 (internal quotation marks and citation omitted))); Weeks Marine, Inc. v. United States, 575 F.3d at 1368-69 ("We have stated that procurement decisions 'invoke [ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (alteration in original) (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))).

"Contracting officers 'are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process,'" PAI Corp. v. United States, 614 F.3d at 1351 (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332), and "[a]ccordingly, procurement decisions are subject to a 'highly deferential rational basis review.'" Id. (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

When the contracting officer's discretion grows, so does the burden on the protestor. As noted in D & S Consultants, Inc. v. United States:

> The protestor's burden becomes more difficult the greater the degree of discretion vested in the contracting officer. DynCorp Int'l v. United States, 76 Fed. Cl. 528, 537 (2007). Negotiated procurements afford the contracting officer a "breadth of discretion;" "best-value" awards afford the contracting officer additional discretion. Id. Therefore, in a negotiated, best-value procurement, the "protestor's burden is especially heavy." Id.

D & S Consultants, Inc. v. United States, 101 Fed. Cl. 23, 33 (2011), aff'd, 484 F. App'x 558 (Fed. Cir. 2012); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (noting that contracting officers have great discretion in negotiated procurements but even greater discretion in best-value determinations than in procurements based on cost alone); PHT Supply Corp. v. United States, 71 Fed. Cl. 1, 11 (2006) ("It is critical to note that 'a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a "best-value" procurement.'" (citations omitted)). "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the

bidder or bidders that will provide the agency with the best value." Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 (citing TRW, Inc. v. Unisys Corp., 98 F.3d at 1327-28; E.W. Bliss Co. v. United States, 77 F.3d at 449; Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59); see also Am. Tel. & Tel. Co. v. United States, 307 F.3d at 1379; Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958; Brooks Range Contract Servs., Inc. v. United States, 101 Fed. Cl. 699, 707 (2011) ("[A] plaintiff's burden 'is elevated where the solicitation contemplates award on a "best value" basis.'" (internal citations omitted)); Matt Martin Real Estate Mgmt. LLC v. United States, 96 Fed. Cl. 106, 113 (2010); Serco v. United States, 81 Fed. Cl. 463, 496 (2008) ("To be sure, as noted at the outset, plaintiffs have a significant burden of showing error in that regard because a court must accord considerable deference to an agency's best-value decision in trading off price with other factors.").

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Tinton Fall Lodging Realty, LLC v. United Sates, 800 F.3d at 1364; see also Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995-96; Enhanced Veterans Sols., Inc. v. United States, 131 Fed. Cl. 565, 578 (2017); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. at 349; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340. The Federal Circuit has indicated that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion . . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1387; Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004).

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351; T Square Logistics Servs. Corp. v. United States, 134 Fed. Cl. 550, 555 (2017); FirstLine Transp. Sec., Inc. v. United States, 119 Fed. Cl. 116, 126 (2014), appeal dismissed (Fed. Cir. 2015); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. at 496. To prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error

is prejudicial."); IT Enter. Sols. JV, LLC v. United States, 132 Fed. Cl. 158, 173 (2017) (citing Bannum v. United States, 404 F.3d at 1357-58); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694-96 (2010). In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'" (citation omitted)).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

In making a request to the GAO to dismiss Ranger American of Puerto Rico's protest of the agency's award to AGMA, FEMA indicated that "corrective action will consist of a re-evaluation of the protester's and awardee's proposals as well as a new award decision." The defendant's cross-motion for judgment on the Administrative Record claims "that the SSEB [Source Selection Evaluation Board] did not reconvene to re-evaluate only the proposals of AGMA and Ranger; rather, the contracting officer made a new best value trade-off analysis award decision based upon the SSEB's prior decision."[22] (brackets added). Additionally, defendant's cross-motion for judgment on the Administrative Record indicates that

> [t]he contracting officer thereafter reevaluated the proposals and conducted a new best value trade-off analysis based on the SSEB's ratings of the proposals. As with the initial award decision memorandum, in the corrective action award decision memorandum (revised award decision), the

---

[22] Although defendant only addresses the proposals submitted by Ranger American of Puerto Rico and AGMA, the Administrative Record does not reflect that the Source Selection Evaluation Board re-evaluated any of the offerors' proposals or ever met after the Source Selection Evaluation Board's initial evaluations.

contracting officer largely adopted the SSEB's technical findings. In other words, the board did not meet again to conduct a new technical evaluation of AGMA's and Ranger's proposals. The contracting officer, did, however, change Ranger's prior Good rating for past performance (seemingly a typo by the SSEB because it was not an available adjectival rating in the RFP), to Superior. She also modified the score of "4" to "3" for Ranger's past performance, which was the value corresponding to a Superior rating. Ranger's overall numerical rating was thus reduced to "15" from "16."

(internal citations omitted).

The virtually unchanged technical evaluation process and analysis by the contracting officer is notable given the numerous evaluation issues raised by Ranger American of Puerto Rico at the GAO, which questioned FEMA's evaluation of Factors 1, 2, 3, and 4, and remained unaddressed after the agency indicated it would take corrective action.

As noted above, in its GAO protest, Ranger American of Puerto Rico contended:

Among other things, Ranger American offered (1) a superior proposal for the Work Plan, Project Management Plan, and Quality Control Plan factors, with many strengths and discriminators; (2) overwhelming superior past performance that substantially reduced risk and added value; and (3) a proposed price to the agency that provided high confidence that the work would be performed satisfactorily and efficiently within the price promised and the Work Plan, Project Management Plan, and Quality Control Plan proposed. Ranger American was materially prejudiced by the agency's failure to properly evaluate proposals under Factors 1, 2, 3, and 4, and to meaningfully consider the discriminators between the Ranger American and AGMA proposals. FEMA's material evaluation errors and failure to conduct a reasonable trade-off and best value determination were contrary to CICA, the FAR, and the RFP terms. If the agency had reasonably evaluated in accordance with the RFP, Ranger American would have received the highest rating for the non-price factors and AGMA would have received reduced ratings under the non-price factors. Moreover, Ranger American had numerous strengths that the agency failed to credit, contrary to the RFP's evaluation criteria and Ranger American's proposal. The agency's failure to recognize strengths in Ranger American's proposal resulted in an unfair and disparate evaluation of Ranger American's proposal.

FEMA also ignored information too close at hand regarding AGMA's deficient past performance. AGMA previously failed on a FEMA contract for similar requirements and otherwise has a poor or inadequate past performance history. If FEMA had reasonably evaluated in accordance with the RFP terms, FEMA would have rated AGMA unsatisfactory or certainly no higher than satisfactory.

The agency carried these errors over into the tradeoff and best value determination. A tradeoff analysis and best value determination based on errors in the evaluation is itself defective. Moreover, the errors in the evaluation mean the agency failed to properly account for the actual discriminators between the proposals in Ranger American's favor. If FEMA had properly considered those discriminators in its evaluation, Ranger American would have received award as best value.

The FEMA best value and trade-off analysis was further materially flawed and unreasonable because it failed to reconcile apparent material disconnects or contradictions between the AGMA non-price and price factors. The AGMA price reflects a buy-in and failure to reasonably and realistically price the RFP requirements. AGMA's non-price proposal may have included some blanket statement of compliance, but AGMA's illusory low price reflects a lack of understanding of contract and labor law requirements and a failure to price what it proposed under the non-price factors. Combined with AGMA's unsatisfactory past performance record, the AGMA proposal presents substantial risk that FEMA failed to consider.

Despite the foregoing, after FEMA took corrective action, the contracting officer made no further technical evaluation changes and did not seek revised proposals from the offerors.[23] Compared to its evaluation in the initial Award Decision Memorandum, FEMA assigned the same technical ratings to AGMA in the Revised Award Decision Memorandum for factors 1 to 4, and the same overall rating of Satisfactory," and likewise assigned AGMA the same empirical values ratings factors 1 to 4, and the same overall rating of Satisfactory." For Ranger American of Puerto Rico, FEMA assigned the same technical ratings for factors 1, 2, and 3, and the same overall rating of "Good," in the Revised Award Decision Memorandum as in the initial Award Decision Memorandum but changed factor 4, Past Performance, from "Good" to "Superior." For the empirical values ratings, FEMA assigned Ranger American of Puerto Rico the same ratings for factors 1, 2, and 3, but changed Factor 4 from a value of 4 to a value of 43, and FEMA changed the total rating for from 16 to 15. The court notes that the revisions to Ranger American of Puerto Rico's past performance rating were not the result of revised proposals or re-evaluation, but to correct mistakes by FEMA in its initial Award Decision Memorandum, as the only ratings available for past performance were: Superior, Satisfactory, Unsatisfactory, and Neutral, and the only empirical values ratings for Past Performance were 3, 2, 1, and 0, and, therefore, Ranger American of Puerto Rico could not be assigned either a technical rating of Good for Past Performance, nor an empirical values rating of 4.

---

[23] The court includes in the technical evaluations past performance, because even though the RRP identified Past Performance as a separate factor from the three Technical Factors, and included a separate chart to explain the rating system for the Past Performance factor in the Revised Award Decision Memorandum as in the initial Award Decision Memorandum, the contracting officer included Past Performance in the "technical evaluation."

The majority of the Revised Award Decision Memorandum was background information on the procurement and the evaluations previously conducted by the SSEB. The new analysis by the contracting officer in the Revised Award Decision Memorandum was limited to the best value trade-off analysis, as follows:

Of the nine offerors, four received technical ratings higher than Unsatisfactory. Of those, Ranger[24] had the best technical proposal with an overall rating of Good, while AGMA had an overall rating of Satisfactory but offered the lowest price.

For the Work Plan (Factor 1), both AGMA and Ranger submitted proposals that met the minimum solicitation requirement, and both were rated Good for this factor. The TET determined that both AGMA and Ranger were found to be technically equivalent in this area.

For the Project Management Plan (Factor 2), both AGMA and Ranger met the minimum solicitation requirement. AGMA's proposal demonstrated a plan in place to fulfill staffing island wide, proper assigned supervision and a detailed description of distribution of resources. AGMA received a rating of Satisfactory. Ranger's proposal demonstrated a detailed understanding of the contract management responsibilities, risk avoidance, and insurance of performance making the contract transition a seamless continuity of operations, as well as good command and field operations structure and a contingency plan in place. Ranger received a rating of Good.

For Factor 3, AGMA's proposed Quality Control Plan demonstrates a staff designated for quality control, a good plan for physical inspections and reporting tools and a good corrective action plan. Ranger's demonstrates a rigorous quality control system in place, monitoring processes, field inspections, supporting software, cost control software, reporting capacity, disciplinary strategies, and internal investigations; and robust training schedule potentially maximizing quality of work. Ranger received a rating of Good. For the Past Performance factor, Ranger received a rating of Superior and AGMA received a rating of Neutral. Neither offerors have known past performance issues. Both Ranger and AGMA proposals met the minimum solicitation technical requirements. Overall, AGMA and Ranger were determined to be technically equivalent with regards to Work Plan, but Ranger's Project Management Plan and Quality Control Plan were both technically superior to AGMA's. Ranger received a Past Performance rating of Superior, while AGMA received a Past Performance rating of Neutral. Ranger received an overall rating of Good, while AGMA received

---

[24] Like defendant, FEMA and the contracting officer sometimes refer to intervenor as "Ranger." At other times, the agency refers to intervenor as "Ranger American."

an overall rating of Satisfactory. However, AGMA's proposed price was lower than Rangers.[25] [sic]

| Offeror Name | Overall Rating | Total Award Amount |
|---|---|---|
| AGMA | Satisfactory | $[redacted] |
| Ranger | Good | $[redacted] |
|  |  |  |

The Solicitation stated that technical factors would be more important than price. Offeror 6 (Ranger) had a 50% higher technical score than AGMA and only a [redacted]% higher price. Ranger had a higher rating with regard to the Project Management Plan, Quality Control Plan, and Past Performance. While Offeror 2's (AGMA) proposal was perfectly adequate, Offeror 6's (Ranger) was significantly better.

Despite listing the numerical and adjectival ratings, the contracting officer did not explain why Ranger American of Puerto Rico's proposal "was significantly better" than AGMA's proposal. In the Revised Award Decision Memorandum, after the corrective action, the contracting officer concluded:

Based on the integrated assessment of all proposals in accordance with the specified evaluation factors, it is hereby recommended that the award be made to Ranger under contract No. 70FBR220C00000019. Ranger's proposal is significantly stronger and offers the best-valued solution to the Government, and the price is determined to be fair and reasonable.

At no point did the contracting officer explain why the corrective action had been taken after Ranger American of Puerto Rico's GAO protest was filed. Despite the detailed accusations by Ranger American of Puerto Rico regarding AGMA's proposal, FEMA's evaluation process, and the award decision, AGMA's evaluation remained largely unchanged from the prior evaluation. FEMA again evaluated AGMA as "Good" for Factor 1, "Satisfactory" for Factor 2, "Satisfactory," for Factor 3, "Neutral" for Factor 4, with no "known past performance issues." The Revised Award Decision Memorandum noted that AGMA met "the minimum solicitation technical requirements," "AGMA received an overall rating of Satisfactory," and the "(AGMA) proposal was perfectly adequate." The Revised Award Decision Memorandum again concluded that AGMA offered a lower evaluated

---

[25] The contracting officer also indicated that

[b]ased on the comparative analysis of the Base and Option Year 1, the lowest priced offeror, AGMA's, proposed price of $[redacted] was [redacted]% lower than the IGCE. The highest priced offeror, Ranger's, proposed price of $[redacted] was within $[redacted] of the IGCE. Price reasonableness was based off adequate competition, comparison to the revised independent government cost estimate of $[redacted] and historical data.

price than Ranger American of Puerto Rico. If Ranger American of Puerto Rico's claims about the failures of AGMA's proposal were the cause of the corrective action it was not articulated by the contracting officer, nor is there a reflection in the analysis after the corrective action. There is not even an explanation for why corrective action was warranted in the above captioned protest in the Revised Award Decision Memorandum.

It is equally unexplained in the record before the court why the contracting officer reached a different conclusion in the Revised Award Decision Memorandum than the initial Award Decision Memorandum. Although the contracting officer referenced each technical factor, past performance, and price, and concluded that "Ranger's proposal is significantly stronger and offers the best-valued solution to the Government, and the price is determined to be fair and reasonable," the contracting officer made no effort to distinguish the new award decision from the original decision by the contracting officer awarding the contract to AGMA, or even compare the two decisions. In fact, the contracting officer did not even mention the initial award decision in her analysis. Additionally, there is no explanation for why FEMA did not give offerors a chance to submit revised proposals after the corrective action.

The Revised Award Decision Memorandum also retained mostly unchanged numerical ratings from the initial Award Decision Memorandum. As described above, the Revised Award Decision Memorandum included the following tables.

Table 1

| RATING CHART | | | | | |
|---|---|---|---|---|---|
| **Offeror:** | **Factor 1** | **Factor 2** | **Factor 3** | **Factor 4** | ***Overall Factor Rating*** |
| Offeror 1: [redacted] | Unsatisfactory | Unsatisfactory | Unsatisfactory | Neutral | **Unsatisfactory** |
| Offeror 2: Agma Security Service Inc. | Good | Satisfactory | Satisfactory | Neutral | **Satisfactory** |
| #3 Offeror 3: [redacted] | Unsatisfactory | Unsatisfactory | Unsatisfactory | Neutral | **Unsatisfactory** |
| Offeror 4: [redacted] | Unsatisfactory | Unsatisfactory | Marginal | Neutral | **Unsatisfactory** |
| Offeror 5: [redacted] | Unsatisfactory | Unsatisfactory | Unsatisfactory | Satisfactory | **Unsatisfactory** |
| Offeror 6: Ranger American | Good | Good | Good | Superior | **Good** |
| Offeror 8: [redacted] | Marginal | Satisfactory | Satisfactory | Satisfactory | **Satisfactory** |
| Offeror 9: [redacted] | Marginal | Marginal | Marginal | Satisfactory | **Marginal** |

Table 2

| Offeror: | Factor 1 | Factor 2 | Factor 3 | Factor 4 | Total Empirical Value | Converted Empirical Value to Overall Rating |
|---|---|---|---|---|---|---|
| #1 | 1 | 1 | 1 | 0 | **3** | Unsatisfactory |
| #2 [AGMA] | 4 | 3 | 3 | 0 | **10** | Satisfactory |
| #3 | 1 | 1 | 1 | 0 | **3** | Unsatisfactory |
| #4 | 1 | 1 | 1 | 0 | **3** | Unsatisfactory |
| #5 | 1 | 1 | 1 | 2 | **5** | Unsatisfactory |
| #6 [Ranger] | 4 | 4 | 4 | 43 | **15** | Good |
| #8 | 1 | 3 | 3 | 2 | **9** | Satisfactory |
| #9 | 1 | 1 | 1 | 2 | **5** | Marginal |

Table 3

| Factors 1 - 3 | Numerical Rating | Factor 4 | Numerical Rating |
|---|---|---|---|
| Superior | 5 | | |
| Good | 4 | Superior | 3 |
| Satisfactory | 3 | Satisfactory | 2 |
| Marginal | 1 | Unsatisfactory | 1 |
| Unsatisfactory | 1 | Neutral | 0 |

Table 4

| Overall Rating | Rating Range |
|---|---|
| Superior | 18 |
| Good | 14 to 17 |
| Satisfactory | 10 to 13 |
| Marginal | 6 to 10 |
| Unsatisfactory | 3 to 5 |

As noted above, Offeror #2 was AGMA, and Offeror #6 was Ranger American of Puerto Rico in both the original evaluation and the post-corrective action evaluation.

Protestor observes that for Factors 1-3, there is the same numerical rating for marginal and unsatisfactory despite a stark difference in adjectival rating system, which stated:

57

| Rating System for Technical Factor 1 –3 | |
|---|---|
| **Rating** | **Definition** |
| Superior | Proposal demonstrates an excellent understanding of the requirements and an approach that significantly exceeds performance or capability standards. Proposal strengths will significantly benefit the Government and risk of unsuccessful performance is low. No significant weaknesses or deficiencies exist. |
| Good | Proposal demonstrates a thorough understanding of the requirements and an approach that exceeds performance or capability standards. Proposal has one or more strengths that will benefit the Government and risk of unsuccessful performance is low. No significant weaknesses or deficiencies exist. |
| Satisfactory | Proposal demonstrates an understanding of the requirements and an approach that meets performance or capability standards. Proposal presents an acceptable solution with few or no strengths and risk of unsuccessful performance is moderate. No significant weaknesses or deficiencies exist. |
| Marginal | Proposal demonstrates a shallow understanding of the requirements and an approach that only marginally meets performance or capability standards necessary for minimal but acceptable contract performance. Significant weaknesses or deficiency exists that may be correctable without major proposal revisions. The risk of unsuccessful performance is high. |
| Unsatisfactory | Proposal fails to meet requirements and one or more deficiencies exist for which correction would require a major revision or redirection of the proposal. A contract cannot be awarded with this proposal. |

Most significantly, an "Unsatisfactory" rating prevents the award of the contract to an offeror, which a "Marginal" rating does not.

Protestor also contends that for the Past Performance factor the numerical rating provided a 0 for neutral and a 1 for unsatisfactory, whereas the rating system for the Past Performance factor provided:

| Rating System for Past Performance Evaluation Factors | |
|---|---|
| **Rating** | **Definition** |
| Neutral | No relevant performance record is identifiable upon which to base a meaningful performance rating. A search was unable to identify any relevant past performance information for the offeror, key personnel, or subcontractors. This is neither a negative or positive assessment. |
| Superior | Based on the offeror's past performance record, it is highly likely that the offeror will successfully perform the required effort. |
| Satisfactory | Based on the offeror's past performance record, it is likely that the offeror will successfully perform the required effort. |
| Unsatisfactory | Based on the offeror's past performance record, it is not likely that the offeror will successfully perform the required effort. |

Defendant responds that "[t]he Ratings Chart assigned the same numerical value of '1' to Unsatisfactory and Marginal for the three technical factors, but that error did not affect AGMA because its lowest adjectival rating was Satisfactory, which converted to a '3,'" and

"the adjectival ratings ultimately controlled the evaluation of the offers because offers rated as Unacceptable were rejected as technically unacceptable, even if the numerical rating assigned to Unacceptable was in error." (internal reference omitted). For Past Performance factor, defendant states

> for the past performance adjectival rating of Unsatisfactory to convert to "1," whereas Neutral converted to "0," that was similarly a *de minimis* error. The RFP explained that if an offeror received a Neutral rating, "[t]his is neither a negative or positive assessment," so it follows that a Neutral rating would convert to "0." And in practical effect, consistent with the RFP, all offerors' whose ratings were Unacceptable were excluded from further award consideration by the contracting officer.

(internal reference omitted).

Defendant also alleges that there was a typographical error for Ranger American of Puerto Rico's numerical past performance rating in the Revised Award Decision Memorandum, albeit framed as a critique of protestor's brief. Defendant contends:

> AGMA's spurious allegation that Ranger received a rating of "43" for past performance, blithely ignores that it was clearly a typographical error in the revised award memorandum, given that Ranger's total score was "15." Had Ranger been given a rating of 43, rather than 3, for past performance, it would have been impossible for it to achieve a score of 15.

(internal reference omitted). Even if errors identified by protestor in this court were de minimis, as argued by defendant, and echoed by intervenor, it throws into sharp relief the decision by the contracting officer not to question the numerical ratings when the initial evaluation was conducted, and not explain when changes were made to the evaluations after the corrective action. The agency had an opportunity after Ranger American of Puerto Rico's GAO protest was dismissed to address any errors the agency may have made in the initial evaluation. Moreover, FEMA could have issued an amendment to the explain the numerical rating system or make the numerical rating a part of the RFP evaluation factors. The court notes that FEMA issued at least seven amendments during the pendency of the GAO protest and then issued additional amendments after GAO dismissed Ranger American of Puerto Rico's protest for corrective action to be taken.

Furthermore, the revised Award Decision Memorandum does not explain why the numerical ratings were adopted in the initial Award Decision Memorandum and included again in the Revised Award Decision Memorandum. As noted above, in the contracting officer's July 31, 2020 declaration attached to defendant's cross-motion for judgment on the Administrative Record, the contracting officer stated, "[f]or assistance in assessing relative technical strengths, I used a system that converted the adjectival ratings into numerical scores." Neither the contracting officer's declaration, nor the record before the court explains why the contracting officer needed "assistance in assessing relative technical strengths," nor why converting the adjectival ratings into numerical scores for

the technical factors would assist the contracting officer in reaching a decision. Nor does it explain why the contracting officer also converted the adjectival ratings into numerical scores for the Past Performance factor. Moreover, regarding the Past Performance factor, left unexplained by the contracting officer is why a neutral pass performance rating would be a "0," but an Unsatisfactory rating, which calls for a conclusion that it is unlikely the offeror could successfully perform the required effort, would be a higher rating of "1." It is equally unclear why for the Technical Factors, a "Marginal" rating and a "Unsatisfactory" rating would be given the same numerical rating of 1, given the difference of the adjectival rating of the two levels in both the RFP and the initial evaluation.[26] Furthermore, it is unexplained why the contracting officer did not address either of these issues in the Revised Award Decision Memorandum.

Protestor further argues that "the entire numerical evaluation scheme was undisclosed (and also irrational, and misapplied)," and contends that "*without* the use of the spurious numerical rating system, award was made to AGMA, but *with* it, award was made to Ranger." (emphasis in original). AGMA therefore, argues that "[t]he prejudice to any offeror from an undisclosed evaluation scheme is virtually automatic, moreover, because it denies an offeror the opportunity to frame its proposal in a manner that is most likely to result in award." (emphasis in original; footnote omitted). Defendant responds that regardless of the numerical ratings

> in the revised decision memorandum, the contracting officer complied with the terms of the RFP when she explained that technical factors were of descending order of importance (that is, Work Plan, Project Management, Quality Control, and Past Performance), with price least important. The contracting officer also referred to the adjectival ratings that the SSEB had assigned, and determined that Ranger was the best value. AGMA cannot show that the contracting officer relied on the alleged unstated evaluation criteria, that is, the arithmetic conversion of adjectival ratings, rather than adjectival ratings, when she determined that Ranger's proposal was the best value to the Government.

(internal reference omitted).

As cited by the protestor and defendant, the undersigned noted in <u>Framaco, International, Inc. v. United States</u>: "'It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation.. . . .'" <u>Framaco Int'l, Inc. v. United States</u>, 119 Fed. Cl. 311, 337 (2014) (quoting <u>Banknote Corp. of Am.,</u>

---

[26] As noted above, a "Marginal" rating was defined as "[p]roposal demonstrates a shallow understanding of the requirements and an approach that only marginally meets performance or capability standards necessary for minimal but acceptable contract performance. Significant weaknesses or deficiency exists that may be correctable without major proposal revisions. The risk of unsuccessful performance is high." An "Unsatisfactory" rating was defined as "[p]roposal fails to meet requirements and one or more deficiencies exist for which correction would require a major revision or redirection of the proposal. A contract cannot be awarded with this proposal."

Inc. v. United States, 56 Fed. Cl. 377, 386 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004)).[27] Similarly, another Judge of the United States Court of Federal Claims explained: "'It . . . is beyond peradventure that the government may not rely upon undisclosed evaluation criteria in evaluating proposals.'" PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 536 (2010) (quoting NEQ, LLC v. United States, 88 Fed. Cl. 38, 48 (2009)). The Judge in PlanetSpace, however, emphasized that

> [n]evertheless, a solicitation need not identify criteria intrinsic to the stated evaluation factors, and agencies retain "great discretion" in determining the scope of a given evaluation factor. Accordingly, for a plaintiff to succeed on a claim of undisclosed evaluation criteria, it must show that the procuring agency used a "significantly different basis in evaluating the proposals than was disclosed" in the solicitation.

Id. at 536-37 (quoting NEQ, LLC v. United States, 88 Fed. Cl. at 48).

Given the paucity of information in the initial Award Decision Memorandum or in the Revised Award Decision Memorandum regarding the numerical ratings assigned to Ranger American of Puerto Rico and AGMA, and how the numerical ratings were applied, compared to the adjectival ratings, the court is not able to conclude that FEMA used a different basis to re-evaluate the proposals after the corrective action than was used prior to the GAO dismissal, notwithstanding the award to Ranger American of Puerto Rico instead of to AGMA. The court finds no clear explanation in the record for how the numerical ratings, and then the adjectival ratings, were assigned to the offerors. Additionally, the court is unable to decern the basis on which the agency used the same ratings to make an award to Ranger American of Puerto Rico instead of to AGMA in the Revised Award Decision Memorandum after making an award to AGMA in the initial Award Decision Memorandum.

Defendant, however, argues that "AGMA cannot show that the contracting officer relied on the alleged unstated evaluation criteria, that is, the arithmetic conversion of adjectival ratings, rather than adjectival ratings, when she determined that Ranger's proposal was the best value to the Government." This argument, however, draws attention to the lack of explanation in the Revised Award Decision Memorandum of how the decision was reached, or on what basis the contracting officer made her decision. Moreover, the court cannot conclude that FEMA used a significantly different basis in evaluating the proposals after the corrective action, a conclusion, which suggests that the agency generally evaluated the proposals in the Revised Award Decision Memorandum in a way that was not transparent and was arbitrary and capricious. The court acknowledges that "[i]t is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 (citing TRW, Inc. v. Unisys

---

[27] The undersigned also made the same observation in Constellation West, Inc. v. United States, 125 Fed. Cl. 505, 535 (2015).

Corp., 98 F.3d at 1327-28); see also Amazon Web Servs., Inc. v. United States, 113 Fed. Cl. 102, 110 (2013) (quoting Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330) ("Contracting officers are afforded 'an even greater degree of discretion when the award is determined based on the best value to the agency.'"). In the above captioned protest, however, at no point, after the corrective action was undertaken did the contracting officer explain why the corrective action and the revised evaluations were occurring, why revisions of proposals were not required by agency, why particular evaluation revisions were undertaken by the agency, or what was wrong with the previous evaluation. Taken as a whole, the actions taken by the contracting officer after the corrective action are considered by the court to be arbitrary and capricious.

The court notes that protestor raises a number of claims about the evaluation by the contracting officer, which occurred in both the initial evaluation and the revised evaluation. For example, protestor argues that "[t]he agency failed to evaluate past performance in accordance with the Solicitation," and states that "FEMA scored Ranger's Quality Control Plan as 'Good,' even though it never used that term to describe the strengths of Ranger's Plan. FEMA scored AGMA's Quality Control Plan as merely 'Satisfactory,' even though it uses the term 'good,' twice, to describe the strengths of AGMA's Plan." (internal references omitted). In response, defendant notes that "although AGMA alleges that the SSEB should have rated its quality control and past performance more favorably, the corrective action did not re-assess either of these factors and AGMA's adjectival ratings remained unchanged." (internal references omitted). Protestor states:

> The Government defends this record of numerous evaluation errors by observing that AGMA "did not challenge its ratings after FEMA initially made award to it" – an argument that the Government makes repeatedly in response to the FEMA evaluation errors that are reflected in the record. That is true, but requiring an awardee to protest an award to itself would represent a dramatic change in procurement law.

(internal reference omitted). As the court has determined that it was arbitrary and capricious for the agency to make the revised award to Ranger American of Puerto Rico, the court does not need to reach the issue of protestor's additional challenges, or whether or not protestor was obligated to raise its concerns prior to the award to Ranger American of Puerto Rico.[28]

As noted above, "[a] bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract," and "[s]econd . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that

---

[28] The court notes that protestor also separately argues that "the award to Ranger should be enjoined because the record does not reflect any reasonable explanation for why FEMA reversed itself and reopened the procurement." The court agrees with defendant that "AGMA could have protested FEMA's decision to undertake corrective action, or even the scope of the corrective action, but chose not to do so."

conduct." <u>Bannum, Inc. v. United States</u>, 404 F.3d at 1351; <u>T Square Logistics Servs.</u>
<u>Corp. v. United States</u>, 134 Fed. Cl. at 555; <u>Archura LLC v. United States</u>, 112 Fed. Cl.
at 496. In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial
> error in the procurement process. <u>See</u> <u>Statistica, Inc. v. Christopher</u>, 102
> F.3d 1577, 1581 (Fed. Cir. 1996); <u>Data Gen. Corp. v. Johnson</u>, 78 F.3d
> 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not
> required to show that but for the alleged error, the protester would have
> been awarded the contract." <u>Data General</u>, 78 F.3d at 1562 (citation
> omitted). Rather, the protester must show "that there was a substantial
> chance it would have received the contract award but for that error."
> <u>Statistica</u>, 102 F.3d at 1582; <u>see</u> <u>CACI, Inc.-Fed. v. United States</u>, 719 F.2d
> 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester
> must demonstrate that but for the alleged error, "'there was a substantial
> chance that [it] would receive an award--that it was within the zone of active
> consideration.'" (citation omitted)).

<u>Alfa Laval Separation, Inc. v. United States</u>, 175 F.3d at 1367; <u>see also</u> <u>Glenn Def. Marine</u>
<u>(ASIA), PTE Ltd. v. United States</u>, 720 F.3d at 912; <u>Allied Tech. Grp., Inc. v. United States</u>,
649 F.3d at 1326; <u>Info. Tech. & Applications Corp. v. United States</u>, 316 F.3d at 1319.
The court has determined FEMA was arbitrary and capricious in making the revised
award to Ranger American of Puerto Rico, and, therefore, the court must determine if
there was a substantial chance of AGMA receiving the award, absent the agency's error.

As noted above in the Revised Award Decision Memorandum, AGMA had the
second highest number total in the numerical rating chart behind only Ranger American
of Puerto Rico. For the best value trade-off analysis, the contracting officer stated:

> Of the nine offerors, four received technical ratings higher than
> Unsatisfactory. Of those, Ranger had the best technical proposal with an
> overall rating of Good, while AGMA had an overall rating of Satisfactory but
> offered the lowest price.
>
> For the Work Plan (Factor 1), both AGMA and Ranger submitted proposals
> that met the minimum solicitation requirement, and both were rated Good
> for this factor. The TET determined that both AGMA and Ranger were found
> to be technically equivalent in this area.
>
> For the Project Management Plan (Factor 2), both AGMA and Ranger met
> the minimum solicitation requirement. AGMA's proposal demonstrated a
> plan in place to fulfill staffing island wide, proper assigned supervision and
> a detailed description of distribution of resources. AGMA received a rating
> of Satisfactory. Ranger's proposal demonstrated a detailed understanding
> of the contract management responsibilities, risk avoidance, and insurance
> of performance making the contract transition a seamless continuity of

operations, as well as good command and field operations structure and a contingency plan in place. Ranger received a rating of Good.

For Factor 3, AGMA's proposed Quality Control Plan demonstrates a staff designated for quality control, a good plan for physical inspections and reporting tools and a good corrective action plan. Ranger's demonstrates a rigorous quality control system in place, monitoring processes, field inspections, supporting software, cost control software, reporting capacity, disciplinary strategies, and internal investigations; and robust training schedule potentially maximizing quality of work. Ranger received a rating of Good. For the Past Performance factor, Ranger received a rating of Superior and AGMA received a rating of Neutral. Neither offerors have known past performance issues. Both Ranger and AGMA proposals met the minimum solicitation technical requirements. Overall, AGMA and Ranger were determined to be technically equivalent with regards to Work Plan, but Ranger's Project Management Plan and Quality Control Plan were both technically superior to AGMA's. Ranger received a Past Performance rating of Superior, while AGMA received a Past Performance rating of Neutral. Ranger received an overall rating of Good, while AGMA received an overall rating of Satisfactory. However, AGMA's proposed price was lower than Rangers. [sic]

| Offeror Name | Overall Rating | Total Award Amount |
|---|---|---|
| AGMA | Satisfactory | $[redacted] |
| Ranger | Good | $[redacted] |
| | | |

The Solicitation stated that technical factors would be more important than price. Offeror 6 (Ranger) had a 50% higher technical score than AGMA and only a [redacted]% higher price. Ranger had a higher rating with regard to the Project Management Plan, Quality Control Plan, and Past Performance. While Offeror 2's (AGMA) proposal was perfectly adequate, Offeror 6's (Ranger) was significantly better.

The best value trade-off analysis demonstrates that there was a substantial chance of AGMA receiving the award, but for the errors in the procurement process.

Permanent Injunction

Having found that FEMA's award to Ranger American of Puerto Rico was arbitrary and capricious, and that AGMA was prejudiced by FEMA, the court turns to consider whether AGMA is entitled to the requested injunctive relief. In Centech Group, Inc. v. United States, the Federal Circuit set out the test for a permanent injunction, stating:

64

> To determine if a permanent injunction is warranted, the court must consider whether (1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief.

Centech Grp., Inc. v. United States, 554 F.3d at 1037 (citing PGBA, LLC v. United States, 1228–29 (Fed. Cir. 2004) (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987))); see also Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd., 357 F.3d 1319, 1325 (Fed. Cir.) (finding that a plaintiff who cannot demonstrate actual success on the merits cannot prevail on its motion for permanent injunctive relief), reh'g and reh'g en banc denied (Fed. Cir. 2004); MVM, Inc. v. United States, 149 Fed. Cl. 478, 492 (2020); Kiewit Infrastructure West Co. v. United States, 147 Fed. Cl. 700, 712 (2020); Remington Arms Co., LLC v. United States, 126 Fed. Cl. 218, 232 (2016defe Success on the merits has been said to be "the most important factor for a court to consider when deciding whether to issue injunctive relief." Dellew Corp. v. United States, 108 Fed. Cl. 357, 369 (2012) (citing Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1312). While success on the merits is necessary, it is not sufficient for plaintiff to establish that it is entitled to injunctive relief. See Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 353 ("Although plaintiff's entitlement to injunctive relief depends on its succeeding on the merits, it is not determinative because the three equitable factors must be considered, as well.") (citing PGBA, LLC v. United States, 389 F.3d at 1228-29). The four factors are to be considered collectively, rather than individually, such that

> "[n]o one factor, taken individually, is necessarily dispositive. . . . [T]he weakness of the showing regarding one factor may be overborne by the strength of the others." FMC Corp. [v. United States], 3 F.3d [424] at 427 [(Fed. Cir. 1993)]. Conversely, "the absence of an adequate showing with regard to any one factor may be sufficient" to deny injunctive relief. Id.

Sheridan Corp. v. United States, 94 Fed. Cl. 663, 668 (2010); see also Computer World Servs. Corp. v United States, 147 Fed. Cl. 584, 595 (2020); Wallace Asset Mgmt., LLC v. United States, 125 Fed. Cl. 718, 727 (2016); Amidon, Inc. v. United States, 124 Fed. Cl. 517, 522 (2015).

In the above captioned pre-award bid protest, as discussed above, AGMA established success on the merits by demonstrating that FEMA acted arbitrarily and capriciously. Having concluded that AGMA succeeded on the merits of its bid protest, the court considers the additional factors to determine whether protestor is entitled to a permanent injunction. Protestor alleges that it will suffer irreparable harm if the court does not issue an injunction and that the balance of the hardships and the public interest weigh in favor of granting an injunction. Defendant and intervenor contend that AGMA has not demonstrated irreparable harm, that the balance of hardships does not weigh in protestor's favor, and that an injunction will not serve the public interest.

Regarding whether or not the protestor will suffer irreparable harm if injunctive relief is not granted, "[w]hen assessing irreparable injury, '[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction.'" Insight Sys. Corp. v. United States, 110 Fed. Cl. 564, 582 (2013) (quoting Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993)); see also Rush Constr., Inc. v. United States, 117 Fed. Cl. 85, 101 (2014); CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 494; Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 743 (2000). "As to the second factor, irreparable harm exists when an offeror has lost the opportunity to compete fairly for a contract." Kiewit Infrastructure West Co. v. United States, 147 Fed. Cl. at 712 (citing HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 245 (2012)). "The Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract." CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 494 (citing CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 390–91 (2010); Serco, Inc. v. United States, 81 Fed. Cl. at 501–02; Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 826, 828 (2002)); see also Remington Arms Co., LLC v. United States, 126 Fed. Cl. at 232 (explaining that the loss of potential work and profits from a government contract constitutes irreparable harm); BINL, Inc. v. United States, 106 Fed. Cl. 26, 48 (2012) ("Irreparable harm is established by a lost opportunity to fairly compete."); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. at 245 (citing several cases); Magnum Opus Techs., Inc. v. United States, 94 Fed. Cl. 512, 544 (2010) ("'A lost opportunity to compete in a fair competitive bidding process for a contract is sufficient to demonstrate irreparable harm.'"), motion to amend denied, 94 Fed. Cl. 553 (2010) (internal citations omitted). The loss of a valuable business opportunity "deriving from a lost opportunity to compete in a fair competitive bidding process for a contract," can be sufficient to constitute irreparable harm. See Overstreet Elec. Co. v. United States, 47 Fed. Cl. at 744 (citing United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. 312, 323 (1998)); see also KWR Constr., Inc. v. United States, 124 Fed. Cl. 345, 363 (2015) (agreeing with protestor that the lost opportunity to compete for a future contract will cause irreparable harm); Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. at 828; United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. at 323 ("[T]he opportunity to compete for a contract and secure any resulting profits has been recognized to constitute significant harm."). According to a judge of this court, "[t]he court has repeatedly held that 'the loss of potential profits' from a government contract constitutes irreparable harm." BINL, Inc. v. United States, 106 Fed. Cl. at 49 (quoting Furniture by Thurston v. United States, 103 Fed. Cl. 505, 520 (2012) (citing BayFirst Sols., LLC v. United States, 102 Fed. Cl. 677, 696 (2012))); see also MORI Assocs., Inc. v. United States, 102 Fed. Cl. 503, 552–53 (2011).

AGMA argues[29]

> [t]his Court has stated that a 'lost opportunity to compete has been found sufficient to constitute irreparable harm.' Int'l Res. Recovery, Inc. v. United States, 60 Fed. Cl. 1, 8 (2004) (citing United Payors & United Providers Health Servs., Inc. v. United States, 55 Fed. Cl. 323, 333 (2003). The loss of AGMA's ability to receive the benefits of its participation in a fair competition is an irreparable injury.

Defendant does not appear in this protest to argue that protestor would be not harmed if the injunction is not granted, stating:

> AGMA argues that it is harmed because it was the previous awardee and it will lose profits and the ability to compete fairly. In contrast, FEMA will be harmed if the Court enjoins Ranger's continued performance and sets aside the award, because FEMA would be without security services and all FEMA facilities would have to be closed, leaving 1,500 FEMA employees without a place to work and billions of dollars of assets unprotected.

Judges of the United States Court of Federal Claims have determined that a protester suffers irreparable injury when it has been deprived the opportunity to compete fairly for a contract. See Wackenhut Servs., Inc. v. United States, 85 Fed. Cl. 273, 311 (2008) (citing Cardinal Maint. Serv., Inc. v. United States, 63 Fed. Cl. 98, 110 (2004)); see also Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 127 (2006), recons. in part, 75 Fed. Cl. 406 (2007). Although the possible disruption of services is an important consideration, FEMA's arbitrary and capricious conduct denied AGMA a fair opportunity to compete for the contract award, even after being alerted to issues with the evaluations in the original procurement decision. Based on the record before the court, and the choices made by the agency during the procurement process, this factor favors protestor.

Defendant's argument also speaks to the third factor, the balance of hardships to the respective parties, and additionally argues that "the Government will suffer harm because, other than Ranger's continued performance on the current solicitation, there is no contract in place for protective service officers and patrolled services to safeguard

---

[29] The court does not agree with AGMA's characterization that

> AGMA already has faced irreparable injury because it has been forced to compete for the same award twice, and AGMA faces further irreparable injury if the performance of the AGMA Contract is delayed further. The Government faces no injury from granting preliminary or permanent relief; it makes no difference to the Government if the Government pays AGMA or Ranger to perform this mandated requirement.

Corrective action is not in and of itself a reason for injunctive relief. Moreover, delay to the procurement process alone does not constitute "irreparable injury," nor is the need to "compete for the same award twice" automatically constitute "irreparable injury."

Federal employees, visitors, and property at both temporary and fixed facilities during the current disaster and emergency declarations for DR-4339 (all counties and municipalities within the Commonwealth of Puerto Rico)." Attached to defendant's cross-motion for judgment on the Administrative Record is a declaration from Carolyn M. Knight, the contracting officer and source selection authority for the procurement. Ms. Knight indicates in her declaration that "Ranger began performance of the solicitation on July 15, 2020. If the Court were to enjoin Ranger from its performance, all of FEMA facilities in Puerto Rico will have to be closed until the issue is resolved due the vulnerability and security risk factors that it involves for FEMA assets and especially for the FEMA staff supporting the LTRO [Long Term Recovery Operations]." (brackets added). The court notes that neither defendant nor Ms. Knight's statement address any potential ways the agency could proceed if the court were to grant the injunctive relief requested by protestor. Although there could be hardship to the government to again revisit the procurement and have to continue to address in the short term a contract for protective service officers and patrolled services, as it has been while the court reviewed the above captioned protect, that hardship is outweighed by the hardship to protestor if a flawed procurement evaluation is allowed to stand, and AGMA is not offered an opportunity to bid, and be subject to a fair evaluation, for the required services for at least a year, possibly longer if FEMA were to exercise the one year option in Ranger American of Puerto Rico's contract.

As to the public interest factor, "'[t]he public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion.'" CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 495 (quoting PGBA, LLC v. United States, 57 Fed. Cl. 655, 663 (2003)); see also Cohen Fin. Servs., Inc. v. United States, 110 Fed. Cl. 267, 289 (2013); United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. at 323 ("[T]he public has a strong interest in preserving the integrity of the procurement process.") (citing Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147, 1153 (Fed. Cir. 1994)); Am. Safety Council, Inc. v. United States, 122 Fed. Cl. 426, 444 (2015) (holding that "the public interest will be served by an injunction by preserving the integrity of the procurement process"); Applied Bus. Mgmt. Sol., Inc., LLC v. United States, 117 Fed. Cl. 589, 608 (2014); BINL, Inc. v. United States, 106 Fed. Cl. at 49 ("With regard to the public interest, it is well-settled that there is a public interest in remedying violations of law."). An important public interest is served for the government to conduct an "honest, open, and fair competition" under the FAR, because such competition improves the overall value delivered to the government in the long term. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 495. "[T]he public interest is served by injunctive relief where the court has concluded that the government violated an applicable regulation and related provisions in the solicitation, and 'maintenance of the integrity of the procurement process weighs heavily in favor of granting a permanent injunction.'" Q Integrated Cos. LLC v. United States, 126 Fed. Cl. 124, 147 (2016) (quoting Springfield Parcel C, LLC v. United States, 124 Fed. Cl. 163, 193 (2015)).

AGMA argues, "'[c]learly, the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid.'" (quoting NetStar-1 Government Consulting, Inc. v. United States, 98 Fed. Cl. 729, 735 (2011)). Defendant responds that it is "in the public interest

to allow Ranger's continued performance of the contract because FEMA did not violate applicable laws and regulations." As the court has found that FEMA's evaluation after the corrective action was arbitrary and capricious, the court finds that there is a public interest in permanently enjoining FEMA from continuing with contract performance with Ranger American of Puerto Rico. On balance, the injunctive factors weigh in favor of protestor and in favor of granting an injunction for Ranger American of Puerto Rico's performance of the contract with FEMA.

## CONCLUSION

As described above, the agency's actions after the corrective action were arbitrary and capricious. Protestor's motion for injunctive relief is **GRANTED.** Given the season, and not to cause an untoward disruption of service in Puerto Rico, the injunction shall be effective as of **Friday, January 8, 2021**. As of January 8, 2021, FEMA shall be enjoined from continuing the performance of Ranger American of Puerto Rico's contract, Contract No. 70FBR220C00000019. Defendant's and intervenor's motions for judgment on the Administrative Record are **DENIED**. The Clerk of the Court shall enter **JUDGMENT** consistent with this Opinion.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

69